Filed 5/30/13

# IN THE SUPREME COURT OF CALIFORNIA

In re MAURICE BOYETTE )
            )         S092356
      on Habeas Corpus. )
_____)

In 1993, an Alameda County jury convicted petitioner Maurice Boyette of two counts of first degree murder for shooting and killing Gary Carter and Annette Devallier. (Pen. Code, § 187.)[1] The jury also convicted petitioner of being a felon in possession of a firearm (§ 12021) and sustained allegations that he was both armed with (§ 12022, subd. (a)) and used (§ 12022.5, subd. (a)) a firearm during the crimes. The jury also sustained a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)), rendering him eligible for the death penalty. Following the penalty phase of trial, the jury sentenced petitioner to death. This court affirmed his conviction and sentence in 2002. (*People v. Boyette* (2002) 29 Cal.4th 381.)

While his appeal was pending, petitioner also filed a petition for writ of habeas corpus in this court. Having found the petition stated a prima facie case for relief on several claims of alleged juror misconduct, this court issued an order on

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

1

November 15, 2006, instructing the Director of the Department of Corrections[2] to show cause why relief should not be granted. We thereafter appointed a referee to determine certain disputed facts. After holding an evidentiary hearing, our referee filed his report with this court, and the parties filed their exceptions to it. The case is now ripe for decision. As explained below, we accept the referee's report and findings as supported by substantial evidence, discharge the order to show cause, and deny relief.

## I. BACKGROUND

### A. The Facts of the Crimes

The facts surrounding petitioner's crimes, set forth in more detail in our opinion on appeal (*People v. Boyette*, *supra*, 29 Cal.4th at pp. 403-407), are not relevant to the analysis of the juror misconduct claims raised in the habeas corpus petition and contained in the order to show cause. Suffice it to say the evidence showed that petitioner acted as a bodyguard for a drug dealer in Oakland named Antoine Johnson; Johnson learned the two victims, Carter and Devallier, had allegedly stolen rock cocaine and cash from a safe house Johnson maintained; and petitioner accompanied Johnson to the house, confronted the victims and, in the ensuing melee, shot and killed both victims at pointblank range.

### B. The Habeas Corpus Petition

Petitioner filed a lengthy petition for writ of habeas corpus raising numerous issues. We found the petition stated a prima facie case for relief as to six claims, all of which related to various aspects of alleged misconduct by jury

---

[2] The Department of Corrections is now called the Department of Corrections and Rehabilitation. (See Gov. Code, § 12838, subd. (a); *In re Large* (2007) 41 Cal.4th 538, 544, fn. 4.)

foreperson Pervies Lee Ary, Sr. (Ary).[3] (See *People v. Duvall* (1995) 9 Cal.4th 464, 475 ["If . . . the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]."].) Accordingly, we issued an order to show cause, directing the custodian "to show cause before this court when the proceeding is ordered on calendar, why the relief prayed for should not be granted on the grounds that: (1) Juror Pervies Ary concealed relevant facts or gave false answers during voir dire concerning his prior felony conviction and other contacts with the justice system; (2) Juror Pervies Ary concealed relevant facts or gave false answers during voir dire concerning the prior criminal records of his sons; (3) . . . ;[4] (4) Juror Pervies Ary

---

[3] Petitioner filed his petition for writ of habeas corpus in 2000, and the petition includes the full names of the trial jurors. Rule 8.332(b)(1) of the California Rules of Court presently addresses protecting juror anonymity in criminal cases, directing that "[t]he name of each trial juror . . . sworn to hear the case must be replaced with an identifying number wherever it appears in any document." As that rule was not effective until January 1, 2007, it could not apply to the petition. The precursor to rule 8.332, former rule 31.3, was effective on January 1, 2004, but even that rule came after petitioner filed his petition. Both rules of court implement Code of Civil Procedure section 237, which provides in pertinent part: "Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, as defined in Section 194, consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section." (*Id.*, subd. (a)(2).)

Although we have generally treated rule 8.332 to have retroactive effect so as to maximize juror privacy, the petition, all subsequent briefing by both parties, as well as our order to show cause and the evidentiary hearing record all identify the jurors by name. As no party has asked to shield the identities of the jurors, we decline to do so.

[4] The order to show cause originally referenced petitioner's claim that Ary had concealed relevant facts when answering question No. 24 on the jury questionnaire, which asked whether he had ever witnessed a crime. In his traverse, however, petitioner stated that, "given the other, numerous and even more egregious falsehoods of Juror Ary . . . , petitioner does not believe that a

*(footnote continued on next page)*

concealed relevant facts or gave false answers during voir dire concerning his problem with alcohol and his son's drug addiction; (5) Juror Pervies Ary introduced information into the jury deliberations concerning an alleged prior murder committed by petitioner Maurice Boyette, although no evidence of such a crime was introduced at trial; and (6) Juror Christine Rennie and one other juror, at the urging of Juror Ary, during the pendency of the jury deliberations, rented and watched a videotape of the movie American Me in order to gather background information for the trial."

The Attorney General, representing the Director of the Department of Corrections and Rehabilitation, thereafter filed a return (see *People v. Duvall*, *supra*, 9 Cal.4th at p. 475), and petitioner responded by filing his traverse (*id*. at p. 476; see generally *In re Bacigalupo* (2012) 55 Cal.4th 312, 332-333). After considering the return (in which the Attorney General conceded the existence of disputed material facts) and the traverse (in which petitioner reasserted his original allegations of juror misconduct), we determined the case turned on disputed questions of fact requiring resolution in an evidentiary hearing. Therefore, on September 9, 2009, we issued an order appointing the Honorable Jon Rolefson, Judge of the Alameda County Superior Court, to serve as our referee in this proceeding and to answer specific factual questions, addressed in more detail below.

---

*(footnote continued from previous page)*

determination of this fact is necessary to proving that Juror Ary was an unqualified, biased juror. Petitioner would prefer to withdraw this allegation rather than prolong litigation in this case." Accordingly, we declined to ask the referee to take evidence on this topic.

4

### C. The Evidentiary Hearing, the Referee's Report, and the Parties' Exceptions Thereto

#### 1. *Ary's Failure to Reveal His Criminal History*

Question No. 25 on the jury questionnaire given the prospective jurors in petitioner's case asked: "HAVE <u>YOU, A CLOSE FRIEND, OR RELATIVE</u> EVER BEEN **ACCUSED** OF A CRIME, EVEN IF THE CASE DID NOT COME TO COURT?" Ary answered "NO." Despite this response, petitioner alleges that Ary himself had several times been accused, and even convicted, of a crime and failed during voir dire to disclose that fact, to wit, that Ary (1) was charged in 1964 with two counts of robbery and grand theft, and was convicted that same year of felony grand theft; (2) was charged in 1971 with seven counts of robbery, but the charges were dismissed for insufficient evidence; (3) pleaded guilty to driving under the influence of alcohol (DUI), a misdemeanor, in 1982 and was placed on probation; and (4) had his probation revoked in 1982 and was reinstated to probation that same year. Ary himself declares he "was arrested in . . . 1963 and spent some time in jail."

Petitioner also alleges his trial attorney was unaware of Ary's felon status or his concealments. A declaration by Walter Cannady, petitioner's lead trial attorney, supports this allegation. Cannady states he was unaware of Ary's prior felony conviction and that, had he known, he would have questioned Ary on the subject. Moreover, based on his experience with the trial judge, Cannady is confident the court would have sustained a challenge against Ary for cause. Cannady further declares he would have used a peremptory challenge to remove Juror Ary in any event.

In the return, respondent agreed a dispute of material facts existed "whether Ary deliberately misrepresented his prior criminal history from decades ago or whether he believed that record had been expunged, was too old to count, or was

otherwise not covered by the questions asked on voir dire." We thereafter directed our referee to answer the following questions: "Given that Juror Pervies Lee Ary was in 1964 convicted of felony grand theft, was incarcerated as a result, was later charged in 1971 with six [*sic*] counts of robbery, later pleaded guilty to misdemeanor drunk driving in 1982, and then had his probation revoked in 1982, and given that Ary failed to disclose this information either on his juror questionnaire or during voir dire in petitioner's trial, what were Ary's reasons for failing to disclose these facts? Was the nondisclosure intentional and deliberate? Considering Ary's reasons for failing to disclose these facts, was his nondisclosure of the above facts indicative of juror bias? Was Ary actually biased against petitioner?"

Ary was the first witness to testify at the evidentiary hearing, and he admitted he had been arrested and convicted of a felony in 1964 and served six months in jail. Ary also was arrested and charged with robbery in 1971, but was exonerated when the actual culprit was apprehended. In 1982, he was arrested for DUI and pleaded guilty to a misdemeanor; his punishment included participation in Alcoholics Anonymous.

Ary further explained that when he was called for jury duty in petitioner's case, he called the telephone number on the jury summons and revealed his 1964 felony conviction, but was told that because he entered military service just after his conviction, his conviction had been expunged and "that I don't have to be concerned with that as having a record." When asked why he did not reveal his 1971 arrest for robbery, as he was clearly "accused" of the crime before his eventual exoneration, he explained that he understood question No. 25 as asking whether he had suffered any convictions, not whether he had merely been accused of a crime, that he had simply read the question incorrectly, and that he had "made a mistake." Regarding his failure to reveal his guilty plea to DUI in 1982, he first

6

stated, "I feel that I should have never gotten that" because he had consumed only two beers in a five-hour period, but then backtracked and said he did not consider the DUI charge to be a criminal matter and it did not seem important enough to mention.

The referee found that Juror Ary honestly misunderstood question No. 25 as asking only for criminal convictions, not merely criminal accusations. "Clearly, the question was not limited to convictions, since it not only used the word 'accused,' but also added the phrase, 'even if the case did not come to court.' On the other hand, there was no further explanation provided, no additional questions on the subject, and no inquiry during voir dire that might have provided clarification. Moreover, Mr. Ary expressed the same misunderstanding of the question while testifying at the hearing. Thus, while his interpretation of the question was certainly unreasonable, it is not unbelievable under the circumstances. Since his only convictions had been set aside, he believed he had none to report."

The referee further found that because Ary "believed" he was answering question No. 25 accurately, "his nondisclosure was not intentional and deliberate," that such nondisclosure was therefore "not indicative of juror bias," and that Ary was not actually biased against petitioner.

Petitioner raises several exceptions to these findings, but we find none meritorious. First, he contends the referee improperly limited his ability to present evidence relevant to the question of prejudice flowing from Juror Ary's various concealments, having erroneously decided "that any evidence of Ary's actions that demonstrated juror bias during the trial [was] barred." As we explain, we conclude petitioner did not preserve this claim for our review and that it lacks merit in any event.

Prior to calling the first witness, petitioner's habeas corpus counsel argued that to prove bias, an issue we had asked the referee to address, she "need[ed] to be permitted to establish by testimony the underlying elements of that question." The referee responded to this argument: "Actually, the Supreme Court has given me very specific guidances [as] to just what I am supposed to determine. The issue of bias, it asks me in Question No. 1, was Mr. Ary's . . . nondisclosure of certain facts indicative of juror bias and was he actually biased against petitioner, and I think you are talking about . . . two different concepts, implied bias and actual bias, and the same questions are asked in Question No. 2, and that's where those issues come in, *and so I agree that those are relevant*, but [proving the juror was] prejudice[d] is a different issue." (Italics added.) Counsel agreed.

Later, when questioning Ary, counsel asked: "Mr. Ary, do you recall asking the [trial court] probably in writing during the guilt phase how can a homeless person obtain private lawyers or are they court appointed?"[5] When the referee sustained the People's objection, counsel asked: "Is that as to all of the questions [Juror Ary] asked? What I'm trying to establish, Your Honor, is I am going to ask the witness if he remembers question by question because he does not remember at this point. . . ." The following colloquy then occurred:

"THE COURT: . . . I have very specific areas of inquiry, and that is not one of them, and I understand that there is a chance that this might peripherally

---

[5] As we explained on appeal, "[d]uring the presentation of the defense case, the trial court received a note from a juror. The juror asked four questions: 'How can a homeless person obtain such private lawyer[s] or are the [defense attorneys] court appointed? [¶] [Regarding] the neighbor who lived 4 houses up the street[,] describe the size of the person he saw standing in the street or over (near) the body (sml, med, lrg) short or tall. [¶] [Is t]his blind person being tried also or what[?] [¶] Did the person on trial [take,] or is he willing to take[,] a lie detector test[?]' " (*People v. Boyette*, *supra*, 29 Cal.4th at p. 429, fn. omitted.)

relate to one of the areas of inquiry that is spelled out by the Supreme Court. *I mean, it could, but I don't see it, so I might need you to explain it to me*.

"[COUNSEL]: Your Honor, I believe it goes to bias, and if you look at the question—

"THE COURT: I am going to ask you to—I'm going to sustain the objection now. I am going to sustain it now. *That's not to say that if at a later time based on other evidence that is presented it becomes clear what the link might be*, I won't let you ask it again, but as of right now, it's sustained." (Italics added.)

Counsel did not later attempt to explain the link between the intended line of questioning and a theory of admissibility. The referee and the parties had earlier agreed that no opening briefs would be filed before the reference hearing, so no fuller explanation of counsel's theory of admissibility was available until her briefs before this court. Here, counsel argues the referee erroneously interpreted our order of reference as limited to Ary's state of mind at the time of the concealment, and thus limited to evidence of possible bias "at the time he omitted material evidence from the questionnaire." According to petitioner, the referee's interpretation of our order led him, for example, to exclude evidence of Ary's "labeling certain jurors as 'naive'; any discussion among some of the jurors concerning the lying in wait special circumstance; Ary's note to the trial court expressing his inappropriate hostility to petitioner." But this theory was not explained to the referee, who specifically indicated he was sustaining the People's objection subject to a later demonstration of how the evidence was relevant. As petitioner did not thereafter try to show the link between the excluded evidence and a material fact to be proved at the hearing, he forfeited the claim. (*People v. Holloway* (2004) 33 Cal.4th 96, 133 [where a trial court tentatively excludes evidence and states counsel is free to later ask the court to change its ruling, failure

9

to do so forfeits the issue for appeal]; *People v. Ennis* (2010) 190 Cal.App.4th 721, 735-736 [same].)

Were we to find the issue was properly preserved for our review, we would find it meritless. For example, question No. 1 of our September 9, 2009, order, which concerns Ary's failure to reveal his criminal past, directed the referee to determine "what were Ary's reasons for failing to disclose these facts? Was the nondisclosure intentional and deliberate? Considering Ary's reasons for failing to disclose these facts, was his nondisclosure of the above facts indicative of juror bias? *Was Ary actually biased against petitioner*?" (Italics added.) Read in context, the question did not ask the referee to answer whether, as a global matter, Ary was a biased juror. Instead, the referee reasonably interpreted the order's language to direct him to determine whether *Ary's concealment of his criminal past demonstrated that he was biased*. The language of the other questions is subject to the same interpretation. Accordingly, we reject petitioner's first exception, both because it was forfeited and because it is meritless.

Second, petitioner contends the referee was mistaken when he concluded Ary "did not disclose his own criminal history on voir dire *because he was not asked about it*." (Italics added.) Clearly question No. 25 asked jurors such as Ary to disclose their criminal history. But immediately following the passage in the referee's report to which petitioner excepts, the report explains that "[t]he only inquiry into this subject was a single question in the written questionnaire . . . ." Accordingly, the referee must have meant that Ary was never asked *orally* about his criminal past on voir dire, a circumstance confirmed by the transcript of the voir dire proceedings.

Third, petitioner excepts to the referee's findings because the referee "failed to give any weight" to the fact Ary gave several different reasons for his failure to disclose his criminal history. Further, according to petitioner, "[t]he hearing

10

record reflects Ary's complete lack of credibility." To be sure, Ary made some inconsistent statements, some of which could have undermined his believability, but "[t]he main reason for an evidentiary hearing is to have the referee determine the credibility of the testimony given at the hearing. [Citation.] Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings and 'give great weight' to them when supported by substantial evidence." (*In re Bacigalupo*, *supra*, 55 Cal.4th at p. 333.) " 'Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying.' " (*In re Price* (2011) 51 Cal.4th 547, 559.)

Although Ary made some inconsistent statements, "we assume the referee considered those discrepancies, along with [the witness's] demeanor, while testifying, before concluding he was a credible witness." (*In re Bacigalupo*, *supra*, 55 Cal.4th at p. 338 (conc. opn. of Liu, J.).) Accordingly, we reject petitioner's contention that the referee's findings as to Ary's credibility are unsupported by substantial evidence. (*In re Hardy* (2007) 41 Cal.4th 977, 993 [we give great weight to findings of the referee that are supported by substantial evidence].) Instead, we conclude that in light of all the evidence, including Ary's demeanor while testifying, the referee reasonably credited Ary's explanation for his failure to disclose his own criminal history when answering question No. 25 on the jury questionnaire.

Accordingly, we reject petitioner's exceptions to the referee's findings and instead accept them, supported as they are by substantial evidence.

11

## 2. Ary's Failure to Reveal His Relatives' Criminal History

In addition to inquiring about the juror himself, question No. 25 also asked whether Ary had *any relatives* who had been "**ACCUSED** OF A CRIME, EVEN IF THE CASE DID NOT COME TO COURT." As noted, Ary answered "NO." Petitioner alleged in his habeas corpus petition that Ary failed to disclose that his two sons, Pervies Lee Ary, Jr. (Pervies Jr.), and Pervies Lee Ary II (Pervies II),[6] as well as two other relatives, had significant criminal histories. Petitioner's documentary support for these allegations shows Pervies Jr. (1) was charged in 1986 with four counts of transportation of narcotics, possession, and possession for sale, and pleaded guilty to all four counts in return for being sentenced to three years' probation on conditions including 210 days in jail; (2) pleaded guilty the same day in a different case to possession for sale of cocaine and was sentenced to probation on conditions including a consecutive term of 150 days in jail; (3) pleaded guilty in 1987 to sale of marijuana, was sentenced to three years in custody, had the sentence suspended, and was committed to the California Rehabilitation Center in Norco due to his narcotics addiction; and (4) pleaded guilty in 1990 to driving with a suspended license, a misdemeanor.

Documents also indicate Ary's second son, Pervies II, had been charged in 1993 with misdemeanor battery and that this criminal charge had been filed the same day Ary was questioned on voir dire in petitioner's case. The battery charge, however, was ultimately dismissed.

In his declaration, Ary also declares that "[o]ne of my first cousins got a life sentence during the 1950s for killing a man." Trial Attorney Cannady declares he was unaware of the arrests and convictions of Pervies Jr., but makes no mention

---

[6] The juror's younger son is sometimes referred to as Pervies Ary II and sometimes as Pervies Ary III. We will refer to him as Pervies II.

12

of Ary's cousin. Cannady declares he would have used a peremptory challenge to remove Ary as a juror had he known these facts.

Respondent, in the return, agreed that a dispute of material fact existed regarding whether "Ary deliberately misrepresented his family's prior criminal records." We thereafter asked the referee to answer these questions: "Given that two of Juror Pervies Lee Ary's sons had criminal records, and that one of Ary's cousins was convicted of murder, and given that Ary failed to disclose this information on either his juror questionnaire or during voir dire in petitioner's trial, what were Ary's reasons for failing to disclose these facts? Was the nondisclosure intentional and deliberate? Considering Ary's reasons for failing to disclose these facts, was his nondisclosure of the above facts indicative of juror bias? Was Ary biased against petitioner?"

At the evidentiary hearing, Ary confirmed he has two sons: Pervies Jr., born in 1964, and Pervies II, born in 1974. Pervies Jr. was arrested in the 1980s on a drug-related charge; Ary remembered because Pervies Jr.'s mother had called him at the time and asked him to help with raising bail. Ary testified that he was estranged from Pervies Jr. and had learned the details of the arrest "after I was a juror" because he "wasn't around" his son. He also testified, however, that he could not say if he had learned of Pervies Jr.'s felony conviction before serving as a juror in petitioner's trial.

Ary's younger son, Pervies II, also had trouble with the law. Sometime before petitioner's trial, Ary accompanied his son to juvenile court to face a misdemeanor charge connected to an incident of road rage. When Pervies II failed to complete an essay assigned as a condition of probation, he was arrested and committed to juvenile hall. At the evidentiary hearing, Ary explained that he did not reveal Pervies II's criminal history on his jury questionnaire because, in his judgment, "it didn't go to court, so I said, well, that's not even important."

13

Clarifying his comment, Ary said he thought he need not mention the matter because it was a juvenile proceeding.

Ary testified at the hearing that he had both a nephew and a cousin who were serving sentences of life without parole for murder, and admitted he had revealed neither relative on his jury questionnaire. He explained the omissions by saying, "I didn't think about it," because the nephew was his ex-wife's sister's son and Ary did not have direct contact with him, and the cousin had been sentenced to life in prison almost 50 years ago and Ary had never had contact with him.

The referee apparently credited Ary's explanations for his nondisclosure of the criminal history of his two sons and other relatives, for after noting Ary's explanations, the referee concluded that "Ary's nondisclosure . . . was due in part to his belief that he was answering the question accurately . . . ." Moreover, Ary's omissions were due "in part to his failure of recollection" and thus were "not intentional and deliberate." Because Ary believed he was answering question No. 25 accurately, his omission of his relatives' criminal history "was not indicative of juror bias," and he was not in fact biased against petitioner.

Petitioner raises exceptions to various portions of the referee's findings, but we find them meritless. First, he contends the sheer number of Ary's relatives with serious criminal records is "revealing" and thus indicative of Ary's intent to conceal. He also contends that Ary's testimony at the evidentiary hearing was inconsistent with what he had told the district attorney's investigator. But these matters were fully aired at the hearing, and we assume the referee took these factors into account before concluding Ary's failure to disclose was unintentional. (*In re Bacigalupo*, *supra*, 55 Cal.4th at p. 338 (conc. opn. of Liu, J.).)

The same reasoning disposes of petitioner's further claim that because Ary testified that at the time of petitioner's trial he knew his son Pervies Jr. had been "arrested numerous times," we should not credit the referee's conclusion that

14

Ary's omissions were due "in part to his failure of recollection." As Ary also testified that all he knew at the time of petitioner's trial was what he had heard from Pervies Jr.'s mother, namely that Pervies Jr. had been arrested the one time, we assume the referee considered these possible inconsistencies before reaching his conclusion.

Petitioner argues for a different result, citing *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970. In *Dyer*, it came to light before the penalty phase of a capital trial that a juror's brother had been shot and killed six years earlier, but the juror had not mentioned the incident in her juror questionnaire. When the trial court held a hearing and questioned the juror about it, she explained she thought her brother's death was an accident, not a crime. The trial court concluded the juror did not demonstrate a lack of candor and allowed her to remain on the jury, which eventually sentenced the defendant to death. The Ninth Circuit Court of Appeals, sitting en banc, disagreed, finding the trial court should have uncovered additional facts that clearly demonstrated the juror's explanation was unbelievable because "the killing had none of the earmarks of an accident." (*Id.* at p. 973.) "[A] judge investigating juror bias must find facts, not make assumptions, and here the key facts were easily discernible. A few questions to [the juror] about her relationship with her brother; an examination of the casefile; a request for confirmation from the prosecutor; an order to bring [her husband] into court—any or all of these would have disclosed that [the juror] knew a lot more about her brother's death than she was letting on." (*Id.* at p. 976.)

Because the federal appellate court found "the facts were not properly developed by the state court, its finding that [the juror] was unbiased is not entitled to a presumption of correctness." (*Dyer v. Calderon*, *supra*, 151 F.3d at p. 979.) The Ninth Circuit thus felt free to determine de novo whether the juror was biased based on new facts discovered by federal habeas corpus counsel. The federal

15

appellate court found her failure to disclose critical facts raised an inference of bias but admitted that whether the juror "was actually biased—i.e., whether she was disposed to cast a vote against Dyer—is difficult to figure out eighteen years later." (*Id.* at p. 981.) Nevertheless, "there is every indication that she was not indifferent to service on the jury. After watching a number of potential jurors disclose relatively minor crimes and get dismissed, she chose to conceal a very major crime—the killing of her brother in a way that she knew was very similar to the way Dyer was accused of killing his victims. She also failed to disclose many other facts that would have jeopardized her chances of serving on Dyer's jury. Later on, when she was questioned about her brother's death, she lied once again by pretending she thought it was an accident, and by telling the judge that no one in her family had testified about the killing. The inference we draw from all this is that [the juror] lied in order to preserve her status as a juror and to secure the right to pass on Dyer's sentence." (*Id.* at p. 982, fn. omitted.)

In the circumstances of the *Dyer* case, the Ninth Circuit Court of Appeals itself made an assessment of the offending juror's state of mind, at the time of her concealment, based on facts developed by federal habeas corpus counsel. The court felt free to do so because it found the state trial court, which had questioned the juror, had failed to conduct a reasonably thorough investigation. By contrast, the issue of the juror's state of mind in the instant case arose *after* trial, and we directed our referee to conduct an evidentiary hearing. The referee made clear credibility determinations after observing Ary and other former jurors testify. Were we to assess the matter de novo, as the *Dyer* court did, we might come to a different conclusion, as Ary's concealments were unusual in their number and breadth. But because the referee's credibility determinations are supported by substantial evidence, and there being no suggestion the referee's hearing was inadequate, we are not at liberty to disregard those findings. As the *Dyer* court

16

itself cautioned: "[W]e must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment. The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." (*Dyer v. Calderon*, *supra*, 151 F.3d at p. 973.) Although we are not bound to follow the decisions of lower federal courts in any event (*People v. Avena* (1996) 13 Cal.4th 394, 431), *Dyer* is distinguishable on its facts and thus unpersuasive.

Petitioner next contends that Ary's recollection of Pervies Jr.'s mother asking him for bail money indicates that Pervies Jr.'s troubles were "significant" for Ary, suggesting that Ary's explanation of his failure to recall the incident should not be believed. We leave it to the referee to sort out these matters and conclude his decision to credit Ary's explanation—after hearing him testify and observing his demeanor—is supported by substantial evidence. (*In re Price*, *supra*, 51 Cal.4th at p. 559.)

Petitioner's final exception concerns Ary's nephews. Petitioner argues that although Ary testified his former sister-in-law's four sons—Ary's nephews by marriage—were all in prison for drug- or homicide-related crimes, "[t]his testimony was ignored by the referee." We reject the claim. Only one nephew's troubles were known to Ary at the time of petitioner's trial, and the referee found the omission nondispositive, reasoning that Ary did not think of the nephew because he was not a person with whom he had had any meaningful contact. Thus, according to the referee, Ary's failure to disclose "the criminal history of family members was due in part to his belief that he was answering the question accurately and in part to his failure of recollection."

We conclude that in light of all the evidence, including Ary's demeanor while testifying, the referee reasonably credited Ary's explanation for his omissions in answering question No. 25 on the jury questionnaire with regard to the criminal histories of his sons and other relatives. We thus reject petitioner's exceptions and accept the referee's findings.

### 3. Ary's Alleged Failure to Reveal His Problem With Alcohol or His Son's Drug Addiction

Question No. 61 on the jury questionnaire asked: "HAVE YOU, A CLOSE FRIEND OR RELATIVE EVER HAD A **PROBLEM** INVOLVING THE USE OF DRUGS OR ALCOHOL?" Ary answered "NO." The question was relevant to jury selection because the murders of Carter and Devallier occurred in connection with the illegal drug trade, and the parties understandably wished to know if a potential juror had any personal connections or problems with that milieu. Indeed, defense counsel at trial specifically informed Ary during voir dire that the killings took place at "a drug house. And some of the people who may testify, you know, may have used drugs." Counsel then asked Ary, "Is that going to cause you any bias or prejudice one way or the other?" Ary replied, "I don't think so."

Petitioner alleged in his habeas corpus petition that despite answering question No. 61 in the negative, Ary was in fact an alcoholic who had been ordered to attend Alcoholics Anonymous as a condition of his misdemeanor DUI conviction in 1982. In addition, his son Pervies Jr. had been sent to the California Rehabilitation Center in Norco because he was a drug addict. Respondent conceded an evidentiary hearing was necessary to resolve disputed facts concerning Ary's answer to question No. 61. We thereafter asked the referee to answer these questions: "Given that Juror Pervies Lee Ary had previously been convicted of driving under the influence and was as a result required to attend

18

meetings of Alcoholics Anonymous, and that one of his sons had several prior criminal convictions for drug-related crimes and had been incarcerated at the California Rehabilitation Center at Norco, and given that Ary failed to disclose this information on either his juror questionnaire or during voir dire in petitioner's trial, what were Ary's reasons for failing to disclose these facts? Was the nondisclosure intentional and deliberate? Considering Ary's reasons for failing to disclose these facts, was his nondisclosure of the above facts indicative of juror bias? Was Ary biased against petitioner?"

Ary's testimony at the evidentiary hearing was essentially consistent with the allegations in the petition for writ of habeas corpus and the district attorney's investigation, as described in the return. Ary admitted that following his guilty plea in 1982 to DUI, his punishment included participation in Alcoholics Anonymous. He admitted he imbibed "socially at clubs or . . . at home," but claimed he had consumed only two beers during a five-hour party before being arrested for DUI. He denied that abstinence from alcoholic beverages was a condition of his probation following his 1964 felony conviction, and further denied he had a problem with alcohol, explaining he answered "NO" to question No. 61 because he interpreted the question as asking whether he was an alcoholic.

Ary also denied that any of his relatives were alcoholics or had a problem with drugs. He knew his son Pervies Jr. had been arrested in the 1980s for selling drugs, that it had "something to do with marijuana," but he did not know whether the crime involved cocaine. When asked whether he knew his son had been sentenced to prison "in order to help rehabilitate himself from [drug] addiction," he replied, "No, I didn't know he was addicted."[7] Ary admitted that a person

---

[7]     In fact, as noted, *ante*, in 1986 Pervies Jr. pleaded guilty in two different cases to marijuana- and cocaine-related offenses and was placed on probation on

*(footnote continued on next page)*

19

could be said to have a problem with drugs "if you are selling drugs instead of making a decent living for yourself," but then asserted that "[t]here was a difference between having a problem and being involved with drugs or alcohol. You can be a drug dealer and never touch the stuff." Although he admitted he knew his older son smoked marijuana, he said that he "wasn't around him that much to say if he did have a problem . . . ."

The referee found that, as far as Ary knew, "he was answering [question No. 61] accurately. He did not consider himself to have ever been an alcoholic. While he did attend AA meetings, he was required to do so as a condition of DUI probation. As for his son's addiction to and commitment for drugs, he wasn't aware of that until some time after [petitioner's] trial. At the time of this trial, he only knew of a drug-related arrest." Because Ary believed he had answered question No. 61 accurately, his nondisclosures were neither "intentional" nor "indicative of juror bias," and he was not, as a result, actually biased against petitioner.

Petitioner raises exceptions to these findings, arguing generally that in light of the inconsistencies between Ary's testimony, his interview with the district attorney's investigator, and his pretrial declaration, he was not credible and the referee's findings are thus not supported by substantial evidence. After considering these inconsistencies, however, and presumably also considering Ary's demeanor while testifying, the referee found him generally credible. Under these circumstances, we defer to the referee's credibility determination.

---

*(footnote continued from previous page)*

condition of 360 days in jail. Following a 1987 guilty plea to sale of marijuana, his sentence was suspended and he was sent to the California Rehabilitation Center in Norco for treatment of his addiction to narcotics.

20

Petitioner identifies some specific inconsistencies. For example, when asked at the evidentiary hearing where he had obtained his knowledge about prison life, Ary revealed for the first time that he had four nephews by marriage—his ex-wife's sister's children—all of whom had been involved in the illegal drug trade in Los Angeles in the 1980s and who had been sentenced to lengthy prison sentences for drug- or homicide-related offenses. But according to Ary, he had been in touch with only one of these nephews prior to serving as a juror in petitioner's case. And although petitioner contends Ary said he learned about prison life from his son and then inconsistently said it was from his nephews, the record in fact shows he denied learning about prison life from his son and instead claimed he learned about an inmate's life in prison from his "previous marriage nephews," from "street talk," and from "listening to what other people have experienced."

Although petitioner contends Ary "could find no credible explanation as to why these relatives were not revealed in the questionnaire," Ary in fact testified that he "wasn't close to them as far as being around them to just, boom, automatically think about them." In other words, Ary did not consider these people to be close relatives, and it did not occur to him to mention them in the questionnaire. Despite petitioner's claims, Ary's explanation is not necessarily inconsistent with his ability to remember certain conversations he had had about prison life with one of his nephews. We conclude that in light of all the evidence, including Ary's demeanor while testifying, the referee reasonably credited Ary's explanation for his omissions in answering question No. 61 on the jury questionnaire. Accordingly, we reject petitioner's exceptions and accept the referee's findings.

21

#### 4. *Ary's Revelation of Petitioner's Prior Homicide During Jury Deliberations*

Petitioner alleged in his habeas corpus petition that Ary committed misconduct by informing other jurors, during jury deliberations, that petitioner had previously committed murder, although no evidence of a prior murder had been introduced at trial. In support of the petition, petitioner submitted a declaration in which Ary declares: "[The jury] discussed the fact that this may have been the first murder for which Mr. Boyette had been caught but that he may have committed previous murders. If we found second degree murder, when he got out in seven years he would feel like he'd gotten away with these killings and would kill again." This description of the deliberations is supported by the declaration of Juror Lewis, which states: "[Ary] told me that during the trial, another alleged murder was mentioned but the judge told us not to consider it. I didn't remember the judge telling us this, but it stuck in the back of my mind after [Ary] told me."

Respondent conceded the following facts were disputed and should be referred to a referee: whether Ary made such comments, whether the comments (if made) occurred during the guilt phase or the penalty phase deliberations, and whether any juror changed his or her vote as a result of such information. We thereafter asked the referee to answer these questions: "Did Juror Pervies Lee Ary assert during jury deliberations that petitioner had previously committed uncharged murders? If so, did this occur during deliberations at the guilt phase or the penalty phase? Did other jurors discuss this topic as well?"

At the evidentiary hearing, Ary testified that the jurors "discussed the fact that this may have been the first murder Mr. Boyette had been caught at. I don't think we discussed what he had done in the past or what he might do again." Moreover, Ary said, "I don't know if he had committed a murder prior to this or would he kill again. I don't know nothing about that . . . ." Asked whether he told

another juror during deliberations that petitioner "may have committed . . . another murder," Ary replied: "It could have been brought up. I don't recollect at this particular time. It could have been stated, and it could have been said that he would kill again. I don't remember." Questioned about a passage in his declaration where he suggested the jurors had discussed whether petitioner had previously committed murder, Ary replied: "[M]aybe I did, maybe I didn't. I don't know."

By contrast, Juror Lewis testified that Ary (whom she knew as the tall, African-American bus driver) told her during the penalty phase deliberations that petitioner had committed previous uncharged murders, saying, " 'now you remember, he did kill somebody else.' " She averred the jurors had learned of the other crime in court but were instructed by the trial judge not to consider it. She was not sure the crime was a prior murder; it may have involved a shooting or merely someone getting injured. Thus, she understood Ary's comment as referring to that information and not a new fact injected into the deliberations by Ary himself.

Other persons who served on petitioner's jury did not recall the subject of uncharged murders coming up during deliberations, or suggested it concerned something they had heard in court and were instructed not to consider.

The referee accepted Ary's testimony and found Ary "did not assert that [p]etitioner had previously committed uncharged murders." Only Juror Lewis recalled such comments, and she was uncertain whether Ary had used the word "kill," but in any event she took his comments to refer to a different crime mentioned in court. Other jurors recalled they had discussed whether petitioner would kill again in prison, and the referee specifically found "Ms. Lewis has confused the two subjects in her memory over time."

23

Petitioner raises exceptions to the referee's conclusions, but once again he merely disagrees with the referee's resolution of credibility issues. For example, he contends it is "difficult to reconcile" the referee's findings with Juror Lewis's testimony that Ary told her during deliberations that she should remember petitioner " 'did kill somebody else.' " Petitioner also emphasizes Ary's somewhat testy responses when faced with his earlier inconsistent declaration on the subject. But other jurors did not recall the comment about a prior murder, and Ary testified he did not remember making the comment. Weighing this evidence, the referee reasonably found Lewis had confused two different events in her mind, i.e., she conflated mention in court of a past crime the trial court had instructed the jury not to consider, with deliberations on the subject of whether petitioner would kill again if sentenced to life in prison. Under the circumstances, we reject petitioner's exceptions and instead defer to the referee's resolution of conflicting testimony, including his conclusion that Ary did not inject any outside information into the jury deliberations.

### 5. *Ary's Encouragement That Other Jurors Watch the Movie American Me to Learn About Life in Prison*

Petitioner alleged in his habeas corpus petition that Ary had urged the other jurors to rent and watch the movie American Me (Olmos Productions, Universal Pictures 1992). The movie allegedly depicts the violence associated with life in a contemporary American prison and focuses especially on Hispanic prison gangs. Petitioner alleged Ary had argued to his fellow jurors that death was the appropriate penalty because petitioner, who was immature and tended to follow strong leaders, would simply join a Black prison gang (such as the Black Guerrilla Family) and continue his murderous ways if given a life sentence, a position that echoed the prosecutor's closing argument. Petitioner further alleged two jurors

24

who were holding out for a life sentence watched the film and eventually changed their vote to impose the death penalty.

Ary's declaration supported petitioner's allegations. He declared: "I told the holdout jurors that if they wanted to understand what it was like in prison, they should watch the movie <u>American Me</u>. That is based on a true story. [¶] Two of the jurors rented the movie and watched it over the weekend. They finally understood that Mr. Boyette could kill again in prison if he was not sentenced to death. After they watched the movie, they changed their votes to death."

Respondent conceded the following facts were in dispute: "which jurors actually watched the movie during deliberations, which jurors had already seen the movie before the trial commenced, and whether any of them changed their decision as a result." We thereafter directed the referee to answer these questions: "Did Juror Pervies Lee Ary urge other jurors, during jury deliberations, to watch the movie American Me in order to learn about the nature of a prisoner's life in prison? Did any juror actually watch the movie at any time during petitioner's trial or jury deliberations?"

The evidence adduced at the evidentiary hearing confirmed many of the allegations in the habeas corpus petition and the supporting declarations. Although some jurors had no recollection of any discussion about watching a movie, Ary himself testified that two female jurors "were so naive about street life" they took the position that life in prison was an adequate punishment because petitioner "will never hurt anyone as long as he is in the penitentiary for life. [¶] I said you just don't know anything about prison life. I said you two go to Blockbuster and get the movie 'American Me.' Sit down and look at it. It will explain penitentiary life to you, and you will see what a person can do while he is in the penitentiary." Jurors Britton, Mann, Orgain and Perez corroborated this evidence, confirming that Ary and other jurors had urged jurors to watch the

25

movie. Although Ary testified that his advice was directed at two "naive" female jurors, Juror McClaren recalled that the advice to watch the movie was directed at three or four jurors who were still undecided. Juror Perez had already seen the movie American Me before being chosen as a juror and recalled that other jurors had too.[8]

Juror McClaren admitted she watched the movie American Me during a break in jury deliberations, and Juror Rennie testified she had watched part of the movie.

The referee concluded that "Ary, along with one or more other jurors, did urge two holdout jurors to watch the movie *American Me* in order to learn more about the nature of a prisoner's life in prison." Moreover, "[t]wo jurors— . . . McLaren [*sic*] and . . . Rennie—did watch the movie during the penalty phase deliberations." Although petitioner has filed exceptions to these findings, he essentially accepts the referee's conclusions, as they are in his favor.

## II. DISCUSSION

Our referee, acting as "an impartial fact finder for this court" (*In re Scott* (2003) 29 Cal.4th 783, 818), has determined the facts of the case. "The referee's factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting. [Citations.] However, such findings are entitled to great weight where supported by substantial evidence." (*In re Hamilton* (1999) 20 Cal.4th 273, 296.) As explained, we reject petitioner's exceptions to the referee's report and instead accept the referee's findings—and accord them great weight—because they are

---

**8**     American Me was released in theaters in the United States on March 13, 1992. (< http://www.imdb.com/title/tt0103671/releaseinfo?ref_=tt_ql_9> (as of May 30, 2013).) Petitioner's trial was held in March 1993.

26

supported by substantial evidence, primarily in the form of credibility determinations of the witnesses. (*In re Hardy*, *supra*, 41 Cal.4th at p. 993; *Hamilton*, at p. 296.) We now turn to the first three of petitioner's claims in our order to show cause, which in fact comprise a single legal question: Is petitioner entitled to relief due to a juror's failure to make certain disclosures on voir dire?[9]

## A. Concealment

We addressed the question of juror concealment at length in *In re Hitchings* (1993) 6 Cal.4th 97: "We begin with the general proposition that one accused of a crime has a constitutional right to a trial by impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; . . .) ' "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' [Citation.]

"The impartiality of prospective jurors is explored at the preliminary proceeding known as voir dire. '*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove

---

[9] The issue in this case concerns Juror Ary's failure to disclose information during voir dire, not petitioner's right to a jury composed of 12 eligible persons. Article VII, section 8, subdivision (b) of the California Constitution provides in part that "[l]aws shall be made to exclude persons convicted of bribery, perjury, forgery, malfeasance in office, *or other high crimes* from office *or serving on juries*." (Italics added.) The Legislature complied with this directive, enacting Code of Civil Procedure section 203, which provides in part: "(a) All persons are eligible and qualified to be prospective trial jurors, except the following: [¶] . . . [¶] (5) Persons who have been convicted of malfeasance in office *or a felony*, and whose civil rights have not been restored." (Italics added.) But "[t]he Sixth Amendment does not bar ex-felons from jury service" (*Coleman v. Calderon* (9th Cir. 1998) 150 F.3d 1105, 1117), and state law (i.e., Code. Civ. Proc., § 203) did not "create a liberty interest protected by the Due Process Clause of the Fourteenth Amendment" in having a jury composed of nonfelons (*Coleman*, at p. 1117).

prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.  [Citation.]  Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . .'  [Citation.]

"The ability of a defendant, either personally, through counsel, or by the court, to examine the prospective jurors during voir dire is thus significant in protecting the defendant's right to an impartial jury.  Of course, the efficacy of voir dire is dependent on prospective jurors answering truthfully when questioned.  As the United States Supreme Court has stated, '*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors.  Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.  The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.'  [Citation.]

"A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct.  [Citations.]

"Without truthful answers on voir dire, the unquestioned right to challenge a prospective juror for cause is rendered nugatory.  Just as a trial court's improper *restriction* of voir dire can undermine a party's ability to determine whether a prospective juror falls within one of the statutory categories permitting a challenge for cause [citations], a prospective juror's *false answers* on voir dire can also prevent the parties from intelligently exercising their statutory right to challenge a prospective juror for cause.

"Such false answers or concealment on voir dire also eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror

28

the party believes cannot be fair and impartial. We have recognized that 'the peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury.' [Citation.] As explained by the Court of Appeal, '[j]uror concealment, regardless whether intentional, to questions bearing a substantial likelihood of uncovering a strong potential of juror bias, undermines the peremptory challenge process just as effectively as improper judicial restrictions upon the exercise of voir dire by trial counsel seeking knowledge to intelligently exercise peremptory challenges.' [Citations.] 'The denial of the right to reasonably exercise a peremptory challenge, be it by either the trial court *or a juror through concealing material facts*, is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.' " (*In re Hitchings*, *supra*, 6 Cal.4th at pp. 110-112, fn. omitted.) We have since cited *Hitchings* with approval. (*In re Hamilton*, *supra*, 20 Cal.4th at p. 295; *People v. Majors* (1998) 18 Cal.4th 385, 417.)

The jury questionnaire asked Ary to disclose his own criminal history, that of relatives and friends, and whether he or a relative had a problem with alcohol or drugs. As is now apparent, he failed to disclose information relevant to all three of these topics. Trial counsel declared that, had he learned of this evidence, he would have exercised a peremptory challenge to remove Ary from the jury. Although juror misconduct raises a presumption of prejudice (*In re Hamilton*, *supra*, 20 Cal.4th at p. 295; *People v. Nesler* (1997) 16 Cal.4th 561, 578), we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the "presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no

29

*substantial likelihood* that one or more jurors were actually biased against the defendant." (*Hamilton*, at p. 296.)  In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias.

On this record, and considering the totality of the circumstances, we conclude Ary was not a biased juror.  As the referee found, some of Ary's omissions from the questionnaire were based on a dubious interpretation of the relevant question, but his interpretation—though erroneous and unreasonable— was sincerely held.  For other omissions, Ary simply did not recall, for example, a distant relative.  We have held that "good faith when answering voir dire questions is the most significant indicator that there was no bias" (*In re Hamilton*, *supra*, 20 Cal.4th at p. 300) and "an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias" (*ibid.*).  Here, the referee's finding that Ary's failures to disclose were neither intentional nor deliberate supplies sufficient support for the ultimate conclusion that Ary was not biased against petitioner.  There being "no *substantial likelihood*" that Ary was "actually biased against" petitioner (*id.* at p. 296), petitioner is not entitled to relief on this ground.

### B.  Reliance on Out-of-court Information

The final two claims both concern the jury's alleged use of out-of-court information when deliberating the question of the proper penalty to impose.  We set forth the applicable law in *People v. Nesler*, *supra*, 16 Cal.4th at pages 578- 579:  " 'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. . . .  [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence

30

developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' [Citation.] As the United States Supreme Court has explained: 'Due process means a jury *capable and willing to decide the case solely on the evidence before it . . . .*' [Citations.]

"We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard."

The first claim is that Ary committed misconduct by introducing into the jury deliberations information that petitioner had previously committed an uncharged murder. Whether Ary in fact did so was disputed, and after holding a hearing on the issue, the referee concluded that "Ary *did not assert* that Petitioner had previously committed uncharged murders" (italics added) and the contrary evidence from Juror Lewis was the result of her having "confused . . . two subjects in her memory over time." Under the circumstances, we conclude no substantial likelihood of bias exists. (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 578-579.)

31

The second claim involved Ary's recommendation to the undecided jurors that they should watch the movie American Me during a break in the penalty phase deliberations to educate themselves about the realities of life in prison. The habeas corpus petition frames the issue as one of juror misconduct *by Ary* that was indicative of *his* bias.[10] After considering whether Ary's encouraging other jurors to watch a movie—standing alone—could be considered prejudicial misconduct had no juror complied with his suggestion, and considering the facts, as alleged, that Juror Rennie and possibly one other juror in fact watched the movie, our order to show cause focused not on Ary's actions but on the jurors who watched the movie. Thus, our order stated in pertinent part: "The Director of Corrections is ordered to show cause before this court . . . why the relief prayed for should not be granted on the grounds that: . . . Juror . . . Rennie and one other juror, at the urging of Juror Ary, during the pendency of the jury deliberations, rented and watched a videotape of the movie American Me in order to gather background information for the trial." Our order to the referee was similarly focused.

As noted, the facts adduced at the evidentiary hearing generally supported petitioner's allegations: the referee found that "Ary, along with one or more other jurors," urged other jurors to watch American Me, and that Jurors McClaren and Rennie in fact watched the movie during the penalty phase deliberations. In doing so, these two jurors committed misconduct.

The trial court instructed the jury at the penalty phase with CALJIC No. 1.03, as follows: "You must decide all questions of fact in this case from the

---

**10**    At least one other juror probably encouraged other jurors to watch the movie as well. Juror Perez testified at the evidentiary hearing that she had seen the movie American Me before being chosen as a juror in petitioner's trial, and that "knowing my personality, I believe I may have" encouraged other jurors to watch it.

evidence received in this trial *and not from any other source.* You must not make any *independent investigation of the facts* or the law or consider or discuss facts as to which there is no evidence. [¶] This means for example, that you must not on your own visit the scene, conduct experiments, *or consult reference works* or persons for additional information." (Italics added.) Although merely to have watched a television show or movie that involved a topic or theme relevant to the subject of a trial is not necessarily misconduct for a sitting juror (*People v. Melton* (1988) 44 Cal.3d 713, 749 [jurors in a capital case may have watched a television broadcast of The Executioner's Song]; *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 556 [jurors in a wrongful death trial involving a light airplane crash watched a *60 Minutes* television broadcast criticizing the safety record of such aircraft]), to "deliberately set out to discover information regarding the issues at the trial" (*Elsworth*, at p. 557) is a different matter. That a juror would watch a movie referred to by other jurors so as to know "what they were talking about" may be natural, but it is clear misconduct in disregard of the court's instructions not to consider any evidence outside that presented in court. As such, it raises a presumption of prejudice "[which] the prosecution must rebut . . . by demonstrating 'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 397.)

In light of the referee's factual findings, respondent concedes the jurors who watched the movie committed misconduct, but argues no prejudice resulted. Did watching American Me and considering the information about prison life contained in the movie establish "a substantial likelihood of juror bias"? (*People v. Nesler*, *supra*, 16 Cal.4th at p. 578.) As we explain, we conclude in the negative.

33

At the outset, we find the information Jurors Rennie and McClaren may have acquired from outside the record (i.e., the contents of the movie American Me) is not the sort of evidence falling within *Nesler*'s first category, i.e., evidence that, "judged objectively, is so prejudicial *in and of itself* that it is *inherently* and substantially *likely* to have influenced a juror." (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 578-579, italics added.)  The information, for example, was not of a suppressed confession or evidence of other crimes that the trial court had excluded as too prejudicial.  (See, e.g., *People v. Holloway* (1990) 50 Cal.3d 1098, 1110 ["The content of the article was extremely prejudicial; it revealed information about defendant's prior criminal conduct that the court had ruled inadmissible because of its potential for prejudice."]; *People v. Andrews* (1983) 149 Cal.App.3d 358 [presumption of prejudice was not rebutted where the jury was inadvertently informed that a codefendant had pleaded guilty to charges stemming from the same crime].)  It was not akin to a bell that could not be unrung.

Here, the movie Jurors McClaren and Rennie watched was one that two other jurors (Ary, Perez), and possibly more, had already seen within the last year. The most that can be said, therefore, is that McClaren and Rennie may have learned some general information about prison life that some of the other jurors already knew—and referenced during deliberations—from having seen the movie themselves before the trial.  (See *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [" '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' "].)  Indeed, had those other jurors simply told Jurors McClaren and Rennie what they had learned from American Me and not suggested the two watch the movie, no issue of misconduct or prejudice would have arisen.  The movie, and the information contained therein, was thus not *inherently* prejudicial within the meaning of *Nesler*'s first category.  (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 578-579.)

34

Turning to *Nesler*'s second category, reversal would be required if the record shows that "from the nature of the misconduct and the surrounding circumstances, . . . it is substantially likely a juror was 'actually biased' against" petitioner.  (*People v. Nesler*, *supra*, 16 Cal.4th at p. 579.)  In other words, did the jurors here improperly acquire information that, *under the circumstances of this particular case*, rendered them biased against petitioner?  As we explain, a consideration of the testimony of jurors at the reference hearing and reasonable inferences therefrom persuade us that no substantial likelihood of bias arose and that any presumption of prejudice is rebutted by the record.

The movie the jurors watched, American Me, had been the subject of discussion during penalty phase deliberations in connection with the point asserted by jurors favoring the death penalty that an incarcerated prisoner could still commit crimes.  Although some of the jurors, including Ary, had seen the film before trial, some of the undecided jurors had not; Ary urged them to do so, maintaining it would illustrate the point that an incarcerated defendant could still commit crimes.  Two of the undecided jurors, McClaren and Rennie, each rented the movie; McClaren watched the entire film, Rennie watched only part of it.  The following morning the jurors resumed deliberations.  Within 30 minutes, the jury foreperson informed the trial court the jury had reached a verdict.

Evidence of a juror's mental process—how the juror reached a particular verdict, the effect of evidence or argument on the juror's decisionmaking—is inadmissible.  (Evid. Code, § 1150, subd. (a).)  Hence, in determining whether there is a substantial likelihood the jurors' misconduct caused them to become biased against petitioner, we look to what the jurors said about their viewing of the film, and what discussion of the film, if any, took place when the jury resumed deliberations the following morning.

Ary testified that upon resuming their deliberations "something" was said about the movie, but the jurors did not specifically discuss it, suggesting the movie was not a significant, if any, part of the deliberations. Juror Salcedo corroborated this version of events, testifying that upon resumption of deliberations after the weekend, she "wasn't aware of anyone that watched the movie," suggesting there was no discussion about it.

Juror McClaren, who admitted to having watched the movie, explained that she was not in a "camp" holding out for a life sentence, but simply "needed more information. I needed more time to make a decision." When asked about her recollection of American Me, she did *not* say that it opened her eyes about life in prison, that she had learned about prison gangs or the Black Guerilla Family or violence in prison, or that it showed how life prisoners could kill within the prison walls. Instead, she replied simply "that it's a prison movie, and it talked about how they contact the people on the outside and could—I don't know. I don't recall a lot of that now either." Although the referee directed McClaren to describe the movie in six words or less, her limited response does not appear to have been a result of that directive; rather, she stated that "I don't recall a lot" about the movie. Her testimony suggests the movie did not make a strong impression on her, as one would expect had it motivated her vote.[11]

Similarly, Juror Rennie testified that she watched part of American Me, "[m]aybe 45 minutes." Describing her recollection of the movie, she said "it was

---

[11] Although the concurring and dissenting opinion suggests that Juror McClaren's failure to recall details of the movie "proves little" because the hearing was held 17 years after the penalty phase deliberations (conc. & dis. opn., *post*, at p. 7), the juror's recall seemed no sharper when she mentioned the incident in her 1999 declaration, just six years after the trial. Juror Rennie executed her declaration in 2000 and likewise provided only the barest of details when asked to recall the movie.

36

rather repetitious. I kind of just wanted to get an idea on what people had been talking about." Upon resuming deliberations the next day, she "eventually" voted for death, although she suggested her change of heart did not happen right away, noting that she changed her vote "at some point." Rennie recalled that "several people voiced concern" that petitioner might kill again if given a life sentence, but she did not remember any discussion about the movie when deliberations resumed, saying that "no one asked anyone if they watched the movie or not, or—and we didn't bring up the subject, and it was just, you know, then continuing on." Like McClaren's testimony, Rennie's testimony suggests the movie's content or message was of little importance to her.

Juror Lewis, who denied watching the movie, had initially been in favor of a life sentence but eventually changed her vote. She testified that the life-leaning (or undecided) jurors did not change their minds and vote for death all at once, but did so "[o]ne by one," thus suggesting the persuasive effect of watching American Me was minimal.

That Jurors McClaren and Rennie watched some or all of the movie during deliberations suggests they were thinking about the issue they faced and the arguments their fellow jurors had made, but does not in these circumstances establish a causal relationship between the movie and the verdict. Rather, from the foregoing testimony we can infer the movie had no significant impact on either juror. Had it been significant, we could reasonably presume one or both, having been urged to watch it or having been persuaded by it, would have mentioned that fact to the others who had seen the film when they cast their vote for the death penalty. Neither did. And their testimony at the reference hearing confirmed the film did not have a transformative effect on their decision. Juror Lewis, who had also been undecided about the appropriate penalty but did not watch the film, similarly reached a conclusion favoring death upon resumed deliberations the next

37

morning.  The evidence, therefore, simply illustrates the unremarkable fact that reflection on the facts of the case and the arguments of fellow jurors, together with the passage of time, will prompt a decision.

The film, significantly, imparted to Jurors McClaren and Rennie no new information about prison life not already possessed by the other jurors who had previously seen the film, information those jurors had already conveyed to McClaren and Rennie during deliberations.  In short, McClaren and Rennie learned nothing in viewing the film they had not already been told; they merely acquired information the other jurors already had.  That they sought out the film does not transform evidence of negligible impact into evidence showing substantial bias.

The sequence of events is the one circumstance suggesting a substantial likelihood of bias, but in the circumstances here it is not determinative.  According to testimony at the evidentiary hearing, during the first full day of deliberations nine jurors concluded death was the appropriate penalty, while at least three jurors (McClaren, Rennie and Lewis) did not decide in favor of death until the next morning.[12]  The two jurors (McClaren and Rennie) who watched the movie proclaimed they had been merely undecided rather than "life-leaning."  According to Juror McClaren, she "wasn't *not* in the camp" voting for the death penalty (italics added); she simply had not yet made up her mind.  Juror Rennie testified that there was some division about the appropriate penalty and she remembered saying that "it's harder for me . . . to come to a conclusion about a sentence," but she did not identify herself as favoring a life sentence.  Juror Lewis, who did not

---

[12]    Ary testified at the evidentiary hearing that the vote on the first day of deliberations was 10 to two in favor of the death penalty, but in fact three jurors testified they had been undecided until the next day.

38

view the movie, testified that she had been voting against the death penalty but changed her vote at the end. These facts suggest the case was not a difficult one in which to conclude the death penalty was appropriate, and that Jurors McClaren and Rennie (as well as Lewis) were simply undecided for a little longer than their fellow jurors. Although one might speculate from the bare sequence of events that watching the movie convinced McClaren and Rennie to vote for the death penalty, their testimony suggests otherwise. That Juror Lewis, who initially leaned toward a life sentence and did not watch the movie, also changed her position within a half-hour of resumed deliberations highlights the speculative nature of inferring bias solely from the timeline of events.

We are similarly unpersuaded by petitioner's further contention that the movie's content or message was particularly prejudicial because it dovetailed with the prosecution's argument regarding petitioner's potential future dangerousness, i.e., that petitioner would kill again in prison if given a life term. Some background is necessary to understand this claim: In presenting his case in mitigation at the penalty phase, petitioner called an expert witness who testified that petitioner suffered from a dependent personality disorder and that he was easily led by persons with stronger, more assertive personalities. This evidence suggested petitioner's crimes—killing Carter and Devallier—were less morally culpable because petitioner was under the sway of Johnson, a drug dealer. When making her closing argument at the penalty phase, the prosecutor attempted to blunt this evidence by suggesting that petitioner, if sentenced to a life term, might simply fall under the influence of another strong personality, join a gang in prison, resume his role as an enforcer, and kill again. The prosecutor's argument specifically referenced the Black Guerilla Family prison gang. Petitioner contends the message of the film American Me lent support to the prosecutor's argument because "[o]ne of the central points of the film maker in *American Me* is that a

39

weak, easily led person who goes into prison will, whether he wants to or not, be forced to become part of a gang and do the gang['s] bidding which includes murder. Moreover, the film depicts itself as being 'a true story' and includes as one of the two primary prison gangs depicted, the Black Guerilla Family—the same prison gang named by the prosecutor."

Although the movie may have been consistent with the prosecutor's argument that someone like petitioner could continue his violent life of crime in prison, the record shows the movie did not introduce any new facts or ideas into the jury room. A number of jurors had seen the movie before the trial and had argued at length during deliberations that petitioner would join a gang in prison and continue to commit crimes. That the information contained in the movie was already before the jury diminishes the potential prejudicial impact of the misconduct despite its consistency with the prosecutor's closing argument.

The "nature of the misconduct and the surrounding circumstances" (*People v. Nesler*, *supra*, 16 Cal.4th at p. 579) thus fails to suggest the movie was an important factor in convincing Jurors McClaren and Rennie to change their minds and vote to impose the death penalty. On this record, we conclude petitioner has not demonstrated a "*substantial likelihood* that one or more jurors were actually biased" against petitioner. (*In re Hamilton*, *supra*, 20 Cal.4th at p. 296.) This "standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . .

40

[Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' " (*Ibid.*)

Finally, we reject petitioner's contention that the cumulative impact of Ary's multiple failures to disclose information on voir dire, coupled with Jurors McClaren and Rennie having watched the movie American Me, violated his right under the state and federal Constitutions to a trial by impartial jurors. Having concluded Ary's omissions did not demonstrate bias, and having found the record rebuts the presumption of prejudice that arose from McClaren's and Rennie's misconduct, the cumulative impact of these events does not convince us petitioner's jury lacked impartiality.

### III. CONCLUSION

Because our order to show cause and reference order were limited to the jury misconduct claims, we do not here address any other claim set forth in the petition for writ of habeas corpus, which will be resolved by a separately filed order.

The order to show cause is discharged.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**

41

**CONCURRING AND DISSENTING OPINION BY CORRIGAN, J.**

The movie American Me[1] stars Edward James Olmos as a young man who is incarcerated and joins a prison gang, which he leads in a violent struggle over drug turf. It is a raw, violent depiction of the American prison system, with multiple scenes of stabbing and sexual assault.

It is *this* movie that two undecided jurors watched during a break in deliberations, at the urging of the jury foreman and other jurors voting for the death penalty. There is no dispute that these two jurors committed misconduct by actively seeking out information not presented at trial. There is no dispute that the jury did not reach a verdict after a full day of deliberations. The next day, after these two jurors watched the film, the jury deliberated for *only 30 minutes* before returning a death verdict. In light of this chronology, I disagree with the majority's conclusion that the presumption of prejudice arising from the jurors' misconduct has been rebutted. The record as a whole demonstrates a substantial likelihood these two jurors were actually biased in that they were influenced to impose the death penalty based on external information they intentionally acquired in violation of their oath.

---

[1]     Olmos Productions, Universal Pictures 1992.

The misconduct must be considered in context. The prosecutor argued against life without the possibility of parole because defendant could join a prison gang and kill again while incarcerated. In urging undecided Jurors McClaren and Rennie to watch American Me, Foreman Ary took up the prosecutor's theme. He explained at the evidentiary hearing: "The two jurors, which [were] the two young ladies, they were so naive about street life until they were so determined that he couldn't harm no one while he was in prison for the rest of his life, and we discussed this, we deliberated and discussed it . . . . We have to do something about this because it's been deliberated too long, so I asked these two young ladies, . . . but these two said he will never hurt anyone as long as he is in the penitentiary for life. [¶] I said you just don't know anything about prison life. I said you two go to Blockbuster and get the movie 'American Me.' Sit down and look at it. It will explain penitentiary life to you, and you will see what a person can do while he is in the penitentiary." Ary told them the movie was based on a true story.

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a

harmless error standard." (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579 (*Nesler*); *In re Carpenter* (1995) 9 Cal.4th 634, 653.)

"Actual bias" in this context does not mean that a juror must dislike the defendant or harbor a desire to treat him unfairly. Rather, "[t]he Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence 'based on the evidence presented in court.' [Citations.]" (*Skilling v. United States* (2010) 561 U.S. __ [130 S.Ct. 2896, 2948]; see *Irvin v. Dowd* (1961) 366 U.S. 717, 723; *People v. Leonard* (2007) 40 Cal.4th 1370, 1414.) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial," and "[t]he term 'actual bias' may include a state of mind resulting from a juror's actually being influenced by extraneous information about a party." (*Nesler, supra,* 16 Cal.4th at p. 581.) "Juror misconduct involving the receipt of extraneous information about a party or the case that was not part of the evidence received at trial creates a presumption that the defendant was prejudiced by the evidence and may establish juror bias." (*People v. Ramos* (2004) 34 Cal.4th 494, 519.)

As the majority acknowledges, Jurors McClaren and Rennie committed "clear misconduct" (maj. opn., *ante*, at p. 33) that raised a presumption of prejudice. Even assuming the movie did not fall within the category of inherently prejudicial material, the present record fails to rebut the presumption of bias. Indeed, the record shows a substantial likelihood that these two jurors *were* actually biased against defendant in that they relied on the extraneous material to his detriment.

The timeline of deliberations provides strong evidence of the movie's influence on these two jurors. The jury began penalty phase deliberations on

3

Tuesday, March 23, 1993[2] at 2:51 p.m. and adjourned nine minutes later at 3:00 p.m. The jury deliberated all day on Wednesday. They resumed deliberations on Thursday at 9:40 a.m. and returned with a death verdict at 10:10 a.m., 30 minutes later.

After a full day of deliberations, McClaren and Rennie remained undecided. That evening, both jurors independently obtained the movie and watched at least part of it. The next day, with little or no discussion of the film, the jury rendered a death verdict within 30 minutes. Given the brevity of deliberations on Thursday, the most reasonable inference is that the movie influenced McClaren and Rennie to vote for death. Indeed, McClaren testified that she was not a "holdout" juror but "simply needed more information" before rendering a verdict. The only "information" she obtained between deliberations on Wednesday and Thursday was the movie. "The foregoing evidence demonstrates that [their] misconduct was substantially related to important matters raised during trial." (*Nesler, supra,* 16 Cal.4th at p. 585.)

Eight of the nine penalty phase jurors who testified at the evidentiary hearing confirmed that the jury discussed the movie during deliberations. Foreman Ary encouraged these "naive" jurors to watch the film because deliberations had gone on "too long." Juror Britton confirmed this account. Juror Perez likewise remembered that two undecided jurors had been encouraged to watch the movie. McClaren herself admitted she was encouraged to watch the movie to see "what life would be like in prison." Based upon the timeline of deliberations, there is little doubt that these events occurred on the only full day of deliberations, Wednesday, March 24. The majority does not suggest otherwise.

---

**2**      Subsequent date references will be to the year 1993.

McClaren testified that she voted for death after seeing the movie. Britton and Perez confirmed that the vote had been 10 to two in favor of the death penalty before McClaren and Rennie saw the film and the vote was unanimous for death thereafter. Ary testified the two jurors voted for death "right after they saw the movie." Rennie testified there was no further discussion of the movie after she had viewed it.

It should be remembered that American Me was hardly an evenhanded documentary about prison life. Its central theme was that prison is a breeding ground for criminal activity. The pro-death jurors here urged watching the film precisely because it made their point, that convicts can continue to kill and commit other crimes while incarcerated. If McClaren and Rennie accepted the film as accurate, their viewing could only have been detrimental to the defense case.

The majority suggests that the timeline did not "establish a causal relationship between the movie and the verdict." (Maj. opn., *ante*, at p. 37.) Noting that Juror Lewis, who did not watch the movie, had also been undecided but eventually voted for death, the majority asserts that "[t]he evidence, therefore, simply illustrates the unremarkable fact that reflection on the facts of the case and the arguments of fellow jurors, together with the passage of time, will prompt a decision." (*Ibid*.) That fact is unremarkable, but we cannot say that is what happened for McClaren and Rennie. The assertion also fails to take into account the relevant standard. McClaren and Rennie's conduct raises a presumption of prejudice. "The rationale for the presumption is venerable. 'A juror is not allowed to say: "I acknowledge to grave misconduct. I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the jury-room." The law, in its wisdom, does not allow a juror to purge himself in that way.' [Citations.] When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties.

5

[Citation.] The presumption of prejudice is appropriate in those situations." (*People v. Cooper* (1991) 53 Cal.3d 771, 835-836.)

This court cannot do for a juror what she cannot do for herself: simply disavow the misconduct. In "reflect[ing] on the facts of the case and the arguments of fellow jurors" (maj. opn., *ante*, at p. 38), there is no dispute that McClaren and Rennie watched a movie about prison gangs. The primary theme of the film is that prison is a breeding ground for criminal activity. After remaining undecided for a full day of deliberations, these two jurors returned the following day and voted for death within 30 minutes. That Juror Lewis, a juror who did not commit misconduct, also voted for death after initial indecision is beside the point. Might McClaren and Rennie have rendered the same verdict had they not seen the movie? Did these jurors actually rely solely upon evidence admitted at trial? We can but speculate. Yet speculation cannot *rebut the presumption* of prejudice that their misconduct raised.

The majority also suggests that the movie might not have affected the two undecided jurors because it introduced "no new information about prison life not already possessed by the other jurors who had previously seen the film, information those jurors had already conveyed to McClaren and Rennie during deliberations." (Maj. opn., *ante*, at p. 38.) Far from rebutting the presumption of prejudice, these facts support it. The accounts of Foreman Ary and Juror Britton confirm that, even though the film's concepts were discussed at length, Jurors McClaren and Rennie remained unpersuaded. Mere verbal descriptions of the movie and the prosecutor's argument failed to persuade these jurors to vote for death. This explains why Ary, in order to break the deadlock, suggested the undecided jurors watch the movie, and why he emphasized it was based upon a true story. The film would graphically illustrate the point the pro-death jurors had failed to convey through mere words.

6

Moreover, the active nature of the jurors' misconduct provides insight into the film's potential influence on them. Jurors McClaren and Rennie each went to Blockbuster, rented the film, and watched it. That they devoted such time to acquiring this extraneous information reflects that they believed it was important to consider in deciding upon a penalty. The jury's speedy verdict after the film was viewed bolsters the conclusion that the film likely influenced the outcome.

The majority reasons the movie could not have had much impact on Jurors McClaren and Rennie because they did not recall the movie in detail at the evidentiary hearing. With respect to McClaren, the majority states: "When asked about her recollection of American Me, she did *not* say that it opened her eyes about life in prison, that she had learned about prison gangs or the Black Guerilla Family or violence in prison, or that it showed how life prisoners could kill within the prison walls." (Maj. opn., *ante*, at p. 36.) Of course, McClaren would have been barred from providing much of this testimony by Evidence Code section 1150, subdivision (a), which prevents jurors from testifying about what influenced them "to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Thus, McClaren and Rennie *could not* have testified about the effect the movie had upon them. Indeed, the magistrate below sustained several objections on this ground when other jurors tried to testify regarding the movie's effects.

With respect to McClaren's alleged failure of recall, the evidentiary hearing was held in 2010, 17 years after deliberations. That McClaren could not recall, at this great remove, all the film's details proves little.[3] Indeed, McClaren could not

<hr>

[3] The majority suggests that McClaren and Rennie's recall of the film was "no sharper" in their written declarations, executed in 1999 and 2000, respectively. (Maj. opn., *ante*, at p. 36, fn. 11.) However, McClaren simply declared that "[t]he

*(footnote continued on next page)*

7

even give a general physical description of Foreman Ary, nor could she recall the duration of deliberations.  The following facts *are* to the point.  McClaren recalled she was urged to see the movie to learn more about "what life would be like in prison," and she voted for death the day after watching it.  At least two other jurors confirmed this timeline.  With respect to Rennie, the majority makes much of the circumstance that she did not watch the entire movie, testifying at the evidentiary hearing that she thought the movie was "rather repetitious"[4] and she watched the movie because she wanted "to get an idea on what people had been talking about . . . being in prison."  Far from suggesting that the movie had little impact, Rennie said she stopped watching the movie because she "had seen enough."  She understood the point of the movie, and "what people had been talking about" when they argued that inmates can continue to commit violent crimes in prison.  The fact that the next day, within half an hour, Rennie voted for death bolsters the conclusion that there was a substantial likelihood the movie removed any remaining reservations.

---

*(footnote continued from previous page)*

movie American Me was also mentioned during penalty deliberations" and did not purport to describe the movie.  Rennie declared that she was "not initially in favor of voting for the death penalty."  Ary, whom she remembered as "the bus driver," suggested that she watch American Me and that "it would be an education for [her] about what prisons were really like."  She further declared:  "I rented the movie one night during the deliberations.  American Me is about gangs in California prisons and it was based on a true story."  Far from suggesting a failure of recall, Rennie remembered the essential facts:  She did not initially vote for death, she watched American Me at Ary's urging to "educat[e]" herself "about what prisons were really like," and the film was about prison gangs and was based upon a true story.  There was no reason in the context of this declaration to give a more detailed account of the film.

[4]      Our own viewing confirms this description.

8

The majority also suggests the movie did not affect deliberations because there was no discussion of it after McClaren and Rennie watched it.  Again, the majority fails to persuasively explain how this circumstance *rebuts* the presumption of prejudice.  If McClaren and Rennie watched the movie and accepted its premise, there would be no need for extensive discussion with 10 other jurors who already agreed.  Indeed, the record confirms there was little discussion about *any* topic on the day of the verdict given the 30-minute time frame.  Although the majority suggests that neither McClaren nor Rennie mentioned they had seen the movie once deliberations resumed (maj. opn., *ante*, at p. 37), this suggestion is at odds with Ary's testimony that one or both of them mentioned the film.  The magistrate sustained a hearsay objection to any further elaboration on the point.  In any event, Ary was well-aware that McClaren and Rennie had seen the movie, suggesting the topic was at least mentioned.  The brevity of subsequent deliberations strongly suggests the movie played a part in the two jurors' decisionmaking.

Finally, the majority relies upon the testimony of Jurors Lewis and Rennie suggesting the undecided jurors did not change their votes in unison.  When asked whether the undecided jurors changed their minds "one by one, or all together," Lewis replied, "One by one."  Rennie initially claimed that, after watching the movie, she did not vote for death "the next day" but she "eventually did."  She later conceded she did not remember whether more than a day had passed between her seeing the movie and voting for death.  Their testimony hardly calls into question the film's likely impact.  The question is not whether McClaren and Rennie changed their minds at the same time, but whether there was a substantial likelihood that they did so because they were improperly influenced.

In sum, Jurors McClaren and Rennie committed misconduct.  At the urging of other jurors, they watched a movie about prison gangs, for the express purpose

9

of acquiring information to use in reaching a penalty verdict.  This misconduct raises a presumption of prejudice against defendant.  The totality of the circumstances "evidence[s] a state of mind that rendered [McClaren and Rennie] unable to perform [their] duty not to prejudge the case and to render a decision based solely upon the evidence presented to the jury."  (*Nesler, supra,* 16 Cal.4th at p. 589.)  Far from rebutting the presumption, the record reveals a substantial likelihood that they were actually biased.  Because this bias affected only the penalty phase, I would reverse the death verdict and remand for a new penalty phase trial.

**CORRIGAN, J.**

**I CONCUR:**

**LIU, J.**

10

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Boyette

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S092356
**Date Filed:** May 30, 2013

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Lynne S. Coffin, under appointment by the Supreme Court, Lynne S. Coffin, State Public Defender, Audrey Chavez and Gail Johnson, Deputy State Public Defenders, for Petitioner Maurice Boyette.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Ronald S. Matthias, Glenn R. Pruden and Christina Vom Saal, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Lynne Coffin
Coffin Law Group
548 Market Street, Suite 95752
San Francisco, CA  94104
(415) 218-8106

Christina Vom Saal
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-3664
(415) 703-5979