Filed 5/15/14  P. v. Rose CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B249247 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA125279) |
| v. | |
| SYLVESTER ROSE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Reversed.

Jasmine Patel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Sylvester Rose, appeals his conviction for attempted criminal threats (Pen. Code, §§ 664, 422).[1]  He was placed on probation for three years.

The judgment is reversed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

Juan Pineda worked as a cashier at a Shell gas station.  On October 7, 2012, a female customer approached him and complained that defendant Rose, a homeless man, was bothering her.  The woman, who looked uncomfortable and scared, asked Pineda to accompany her back to her car.

As Pineda was walking with the woman, he saw Rose standing near the gas pumps.  When Pineda told Rose to leave, Rose yelled he would blow Pineda's fucking head off and said he knew what time Pineda got off work.  Pineda testified he was scared because he believed Rose would carry out his threat.  Asked why, Pineda said: "Because I don't know this man and I don't know what he's capable of doing."

Pineda testified that, a few days earlier, Rose had come into the gas station convenience store to buy a cigarette lighter.  Pineda refused to sell him the lighter because Rose would not put his crack pipe away.  Rose got angry and raised his voice. Although Pineda could not recall Rose's exact words, he said Rose was being "really loud" and had "saliva coming out of his mouth."

On October 7, Pineda called 911 after Rose threatened to blow his head off. He told the operator Rose was "messing with the customers" and, when Pineda told him to leave, Rose "decides to threaten me, talking about he's gonna blow my head off." Pineda told the operator Rose did not seem to be armed, but "he might be intoxicated" on drugs or alcohol because "[h]e doesn't look sober at all."  The operator said someone would be sent to the gas station, but no one came.

---

[1]     All further references are to the Penal Code unless otherwise specified.

A 911 operator called back later and asked if Rose were still there. Pineda said he had to "take a look," and then he told the operator Rose "doesn't seem to be here anymore." The operator explained things had gotten busy and told Pineda "if [Rose] comes back and you need us, call us back."

Pineda testified Rose returned to the gas station the following day:

"Q. [D]id you see him doing anything specific when he got to the gas station?

"A. Just standing around.

"Q. And when you saw him what did you do?

"A. I went outside. My manager was just leaving, so I went outside and I told him there was a guy that I had called the cops on a previous time and I told him I was going to call again because I was told to do that when he came back.

"Q. Were you concerned about your safety?

"A. Yes."

Pineda called 911, told the operator about having called the day before, and said Rose had returned: "[H]e's over here threatening me again, threatening some of the . . . customers, and . . . he knows what time I get out of work, so he's telling me that . . . he's gonna come back after work." Pineda told the operator Rose was "by the fence . . . towards the back" of the property, "just walking back and forth." Pineda testified the police arrived within five or ten minutes of this 911 call.

Officer Brett Clark testified he found Rose sitting on a curb near the gas station and arrested him. Rose did not have any weapons on him. Asked to describe Rose's behavior, Clark testified: "Initially, he was a little standoffish. Once he realized he was going to jail he started calling us motherfuckers, every name in the book, nonstop through all the booking process."

Pineda acknowledged that on the day of the arrest Rose had not been "threatening any customers or anything like that." However, Pineda assumed Rose had been panhandling and, after having had the complaint from the customer the day before, Pineda wanted Rose off the premises:

"Q. In your mind was it a problem for your customers that he was there, and what he was doing?

"A. It became a problem to me after I got the complaint.

"Q. And you're concerned because if Mr. Rose is bothering your customers there might be less business for you and the Shell Gas Station; right?

"A. It's different things. It's that but it's also complaints, if a customer complains about somebody outside to my boss then my boss will complain to me and I don't want to get in trouble."

Pineda testified homeless people often came to the gas station and that he generally does not ask them to leave: "I try to be fair. I tell them as long as I don't get a complaint from the customers or if they . . . keep the [place] clean, [but] if they don't do it I have to tell them . . . to leave." No homeless person besides Rose had ever threatened Pineda.

Pineda had never seen Rose with a gun or any kind of weapon. He testified Rose had never threatened him other than on this single occasion. However, Officer Clark testified Pineda told him Rose had threatened him three times: on October 5, 7 and 8. Pineda testified he did not recall saying this to Clark.

Pineda acknowledged that in 2011 he had been convicted for misdemeanor theft, felony hit and run, and felony "joy riding" (taking a vehicle without the owner's consent).

The jury acquitted Rose of making criminal threats, but convicted him of the lesser included offense of attempted criminal threats.

## CONTENTS

1. The trial court misinstructed the jury on attempted criminal threats.

2. There was jury misconduct.

3. A Government Code section 76104.7 DNA penalty assessment was mistakenly imposed.

4

## DISCUSSION

1. *Jury was misinstructed on attempted criminal threats.*

Rose contends the trial court misinstructed the jury on the lesser included offense of attempted criminal threats, the crime for which he was convicted. This claim has merit.

     a. *Legal principles.*

Section 422, subdivision (a), provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

In *People v. Toledo* (2001) 26 Cal.4th 221, our Supreme Court said: "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat – which may be 'made verbally, in writing, or by means of an electronic communication device' – was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate

5

family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*Id*. at pp. 227-228.)

*Toledo* pointed out there were certain situations in which a defendant would have committed no more than the lesser included offense of *attempting* to make a criminal threat. "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat. For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur. Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*People v. Toledo, supra,* 26 Cal.4th at p. 231.)

*Toledo* went on to explain: "[These] examples . . . demonstrate that in most instances the crime of attempted criminal threat will involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation (for example, because the threat is intercepted or not understood, or because the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances). In each of these situations, a defendant who is convicted of attempted criminal threat will be held criminally responsible only for speech that clearly

6

is not constitutionally protected, and thus it is evident that in these instances a conviction of attempted criminal threat will pose no constitutional problems." (*People v. Toledo, supra,* 26 Cal.4th at pp. 233-234.)

This kind of circumstance occurred in *Toledo*, a domestic dispute altercation in which the victim testified she was never in fear despite the defendant's threat to kill her. Rejecting the defendant's contention there was no such crime as attempted criminal threats, *Toledo* reasoned the jury could have found that, although defendant's death threat had been "made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and reasonably could have caused [the victim] to be in sustained fear for her own safety," there was "a reasonable doubt . . . as to whether the threat *actually* caused [the victim] to be in such fear. Thus, the jury evidently found defendant guilty only of attempted criminal threat rather than the completed crime of criminal threat, not because defendant's conduct fell short of that required by the criminal threat provision, but simply because defendant's threat happened not to have as frightening an impact upon [the victim] as defendant in fact had intended." (*People v. Toledo, supra,* 26 Cal.4th at p. 235.)

In *People v. Jackson* (2009) 178 Cal.App.4th 590, the defendant was unacquainted with the victims, who had served an eviction notice on their tenant and then visited the property to collect the key. The victims found the defendant, a friend of the tenant's, asleep in one of the bedrooms and told him to leave. Defendant responded by saying, " ' "I'm going to get an AK-47 and blow all your heads off." ' " (*Id.* at p. 594.) The jury convicted him of attempted criminal threats. On appeal, he argued "the trial court erred in failing to instruct the jury, sua sponte, that, in order to find him guilty of attempted criminal threat, it must find that 'it would have been reasonable for a person to have suffered sustained fear as a result of the threat under the circumstances of this case.' " (*Id.* at p. 595.) *Jackson* rejected the Attorney General's contrary argument that the crime of attempted criminal threat has no reasonableness element: "[A]s *Toledo* described it, a conviction for attempted criminal threat requires a finding that the defendant specifically intended to engage in the proscribed conduct – to make the type of threat

7

prohibited by section 422 – in order to bring about the proscribed consequence – fear that would be reasonable in the circumstances. Indeed, *Toledo*'s description of an attempted criminal threat encompasses all the elements of the substantive crime except the subjective response of the victim. [Citation.]" (*Id*. at pp. 597-598, fn. omitted.)[2]

*Jackson* went on to hold the trial court had prejudicially misinstructed the jury on the elements of attempted criminal threat: "In finding defendant not guilty of the completed crime but guilty of attempt, the jury must have found that defendant made the 'blow-your-head-off' statements and that he intended them to be taken as threats but that one or both of the last two elements of the completed crime was missing, namely that [the victims] did not suffer sustained fear or that their fear was unreasonable under the circumstances. The instruction allowed the jury to find defendant guilty of attempted criminal threats under either of these factual scenarios. And the evidence would support either scenario. The jury might not have believed [the victims] when they stated they actually feared for their lives. Or, the jury might have concluded, since [the victims] were safely inside the house with a telephone to call the police while defendant sat out front, or since defendant's threats were so outlandish, that defendant's statements could not reasonably have caused the victims to suffer sustained fear. The latter scenario is legally insufficient to support conviction of an attempted criminal threat and the former scenario is sufficient only upon finding that a reasonable person could have suffered fear in those circumstances, something the jury was not asked to decide. Since there is nothing in the record upon which to find that the verdict was actually based on a valid ground, we must reverse. [Citation.]" (*People v. Jackson, supra,* 178 Cal.App.4th at p. 600.)

---

[2]       *Jackson*'s interpretation of *Toledo* is currently under review by our Supreme Court in *People v. Chandler* [formerly published] (2012) 211 Cal.App.4th 114 ( review granted February 13, 2013, S207542).

b. *Discussion.*

(1) *The trial court committed instructional error.*

In the case at bar, the trial court gave a standard attempt instruction, explaining that Rose would be guilty of attempted criminal threat if the jury determined he had taken a "direct but ineffective step toward committing the criminal threat; and . . . intended to commit a criminal threat." After more fully explaining the concept of "direct step," the trial court said: *"To decide whether the defendant intended to commit a criminal threat,* please refer to the separate instructions I just gave you on that crime. (Italics added.) This instruction was similar to the one found wanting in *Jackson.*[3]

The Attorney General asserts *Jackson* was wrongly decided because the offense of attempted criminal threats does not have an objective reasonableness element. She argues: "Under section 422, the completed crime of making criminal threats requires that the victim's fear be reasonable under the circumstances. Statutorily, however, the crime of attempting to make a criminal threat does not require that it would actually be reasonable under the circumstances for the victim to be in fear. All it requires is that

---

[3]    In *Jackson*, the trial court's attempted criminal threat instruction referred the jury back to the criminal threat instruction, but in that context mentioned only the specific intent element and said nothing about the reasonable fear element. *Jackson* explained that, as a result, the jury had likely ignored the reasonableness element. The jury had been instructed "on the crime of attempted criminal threat using the general language of attempts, namely that to find defendant guilty of attempted criminal threat the jury had to find that defendant intended to make a threat of violence and that he took a direct step toward acting on his intent. The [trial] court then stated, 'To decide whether the defendant intended to commit threats of violence, please refer to the instructions I just gave you as to Counts one and two' That is, the court simply referred the jury back to the elements of the substantive crime. *The problem with that was that the instruction on the substantive crime included the reasonableness element only as part of the result of the completed crime, i.e., that [the victims] suffered fear and that the fear they experienced was reasonable. Thus, in deciding whether defendant had the intent necessary to support conviction for attempted criminal threat, the jury was not instructed to consider whether the intended threat reasonably could have caused sustained fear under the circumstances.*" (*People v. Jackson, supra*, 178 Cal.App.4th at p. 599, italics added.)

9

(1) the defendant took a direct but ineffectual step toward making a criminal threat, and (2) the defendant had the specific intent to make a criminal threat, including the specific intent that the victim be in fear and that the victim's fear be reasonable under the circumstances."

But we do not understand what it means to say a "defendant had the specific intent . . . that the victim's fear be reasonable under the circumstances." That is, how could a jury determine, *not* that a victim's fear was objectively reasonable given the circumstances, *but rather* that the defendant specifically intended the victim's fear would have been reasonable given the circumstances?

In any event, *Toledo*'s explanation of the elements of the crime of attempted criminal threats would seem to foreclose any such interpretation: "Under the provisions of section 21a, a defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, *under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety*." (*People v. Toledo, supra,* 26 Cal.4th at pp. 230-231, italics added.) It appears all the italicized elements are objective factors having nothing to do with the defendant's subjective state of mind and, therefore, that the crime of attempted criminal threats does have a reasonableness element.

We conclude the trial court erred by failing to have the jury determine if Rose's threat would have reasonably caused Pineda's fear. Hence, we must decide if this error was harmless or prejudicial.

10

(2) *Prejudicial error.*

The failure to instruct on an element of an offense is subject to *Chapman*[4] harmless error analysis. (See *Neder v. United States* (1999) 527 U.S. 1, 18 [119 S.Ct. 1827] ["Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"].)[5]

This is not a case where the circumstances plainly showed Pineda's fear would have been reasonable. Given the evidence Rose may have done nothing more than conduct himself in a loud and boorish manner, this is a case where we should be mindful that section 422 " 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others.' [Citation.] In other words, section 422 does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861.)

The evidence showed Rose, who appeared to be unarmed, simply walked away after threatening to blow Pineda's head off. During their only previous encounter, Rose got mad and started shouting when Pineda refused to sell him the cigarette lighter, but Pineda testified Rose was merely yelling "to himself." Noting Pineda's testimony, that on the day he was arrested Rose seemed to be intoxicated, Rose argues "the jury could have easily concluded . . . that appellant was not uttering a criminal-level threat but was rather an intoxicated homeless man making outlandish threats."

Indeed, Rose's threat was almost as outlandish as the threat in *Jackson*, where a total stranger threatened to acquire an assault rifle and blow off the landlords' heads. Pineda knew Rose was one of the homeless people who routinely congregated at the gas station in order to panhandle the customers. Pineda had never seen Rose with any sort

---

[4]     *Chapman v. California* (1967) 386 U.S. 18 [87 S.CT. 824].

[5]     We reject Rose's assertion that we are obligated to make this determination by considering the evidence in the light most favorable to him. The cases he cites in support of this assertion are inapposite, generally dealing with the question of whether an instructional error occurred, *not* whether the error was harmless or prejudicial.

11

of weapon. Rose points out that, in denying his new trial motion for juror misconduct (see discussion, *post*), the trial court said: "And this is a crime where words can be enough if they are said in a way that would be enough to raise sustained fear in a reasonable person and under those circumstances. Here *it could be that the jury maybe felt that it wasn't reasonable for sustained fear and that's why they came back with a lesser offense. We don't know*." Rose's point is that one reason we don't know is because the jury had not been clearly instructed the People had to prove the objective reasonableness of Pineda's fear in order to convict on the lesser included offense of attempted criminal threats. Rose argues: "If the trial court thought that the jury concluded it was not reasonable for Pineda to have sustained fear, this surely establishes that appellant was prejudiced by the instructional error . . . ."

However, we need not decide the prejudice issue on the basis of this error alone because there was a second error affecting Rose's trial.

2. *There was jury misconduct.*

Rose contends there was jury misconduct during deliberations. This claim, too, has merit.

a. *Background.*

During deliberations, the jury foreperson sent a note to the trial court indicating Juror No. 10 had announced she was acquainted with Pineda.[6] The court summoned Juror No. 10, who said she recognized Pineda when he took the witness stand because she was a regular customer at the gas station: ". . . I've seen him, he is a cashier, he always tells me I remind him of a girl he knew. So every time I pump gas I say 'How's it going.' " The juror has been to this gas station "[a] lot. I actually live around there." She did not say anything to the other jurors about this until deliberations were already

---

[6] The note said: "Juror recognized plaintiff [*sic*] during trial, # 10[.] Juror is a customer of the station. Has spoken to the plaintiff on occasions while at station. Has observed homeless people & knows the layout of the station."

12

underway.  Besides saying she knew Pineda, she told the other jurors there were many homeless people at the gas station but she had never seen Rose there.

The other jurors were then asked what Juror No. 10 said in the jury room. The foreperson said Juror No. 10 had not spoken at all during deliberations until prodded for her opinion, at which point she announced she knew Pineda:  "Well, she said words to the effect that when [Pineda] came in she recognized him and she had spoken to him in the past while pumping gas, and he seemed like a real pleasant guy."  Other jurors started asking her "about the layout of the gas station" and she said it "is filled usually with a lot of homeless people . . . .  [¶]  Those are the only two things she shared with us, that he seemed like a pleasant guy, and that there were lots of homeless people there asking for money."

The remaining jurors reported similar statements by Juror No. 10.  According to Juror No. 5:  "She said there are a lot of homeless people there but she said she never saw Mr. Rose."  According to Juror No. 7:  "[S]he said [Pineda] seemed like a nice guy, that he . . . was good to the customers, that he was nice."  According to Juror No. 8: "She said 'I know that guy.  I live down the street and I go there to get gas and he's a nice guy.'  She said, 'When I buy gas I give him the money and he always speaks and asks me how is my day.'  And she also said that there's [a] lot of homeless people that hang around out there."  "She said some of [the homeless people] are regulars and they're always asking people for money.  They don't bother anybody."  According to Juror No. 12:  "She did say he was a nice guy, a calm person from meeting him behind the booth."  "She said she had never seen Mr. Rose and there are quite a few homeless people there."  All of the jurors told the trial court that, despite having heard this information, they could render an objective verdict.

After hearing from the jurors, the trial court said:  "The only thing that concerns me is that she made the comment about him being a nice guy.  She also said though that there are a lot of homeless people out there.  So she said things that are supportive of what both of you have argued that could support your respective cases.  But the bottom

13

line is, my intention would be to replace her with the alternate. Order them to set aside all deliberations, and order them to start all over again . . . ."

Defense counsel objected and asked for a mistrial, arguing Juror No. 10 had "infected the whole jury. Basically Mr. Pineda's credibility is the heart of the case. And now she's told each and every juror that she knows him, that he's a nice guy. That she's been there, that he deals with the customers courteously, is nice and good to the customers. I think the jury has been infected and they're not going to be able to put that aside."

The trial court refused to declare a mistrial. Instead, the court replaced Juror No. 10 with an alternate, ordered the jury to begin deliberations anew, and instructed them: "Now, earlier I mentioned to you that you are not here to judge either Mr. Rose or to judge the victims [*sic*] as individuals. . . . You aren't to determine whether they're good or bad people. You're not to consider sympathy, passion, prejudice or bias as it relates to the witnesses or Mr. Rose."

   b. *Legal principles.*

"Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. [Citations.] . . . [¶] We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, . . . " (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579.)

14

"Although juror misconduct raises a presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' [Citation.]" (*In re Boyette* (2013) 56 Cal.4th 866, 889-890.)

### c. *Discussion*.

The Attorney General argues the presumption of prejudice was rebutted because the trial court replaced Juror No. 10, the other jurors affirmed they could be fair and impartial, and the extra-judicial information was not inherently prejudicial because "[c]redibility deals with veracity, and being pleasant, nice, or calm to customers arguably has nothing to do with whether one is truthful." We would add it is possible the other jurors simply shrugged off Juror No. 10's comments on the theory her chit-chat relationship with Pineda was so clearly superficial that her judgment of his character was worthless.

On the other hand, only two witnesses testified in this case: Pineda and Officer Clark. Pineda was the only eyewitness and his testimony about what Rose did was completely uncorroborated. As Rose reasonably argues, "[I]n a case like this where proof of guilt depends on the victim's testimony about the circumstances, the fear experienced, and the nature of the threat, any outside favorable information presented after the parties have rested creates a substantial possibility that the jury will conclude that the victim should be believed because he is a nice calm guy, where they might have otherwise concluded that the irrational threats of a homeless intoxicated man could not reasonably have raised sustained fear."

The heart of the defense case was indeed an attack on Pineda's credibility, which was pursued on several fronts: his criminal history; the parts of his testimony arguably suggesting he had embellished the encounter because he wanted Rose removed from the

15

premises for other reasons; and, inconsistencies in the evidence arguably revealing Pineda had doctored his story.

During closing argument, defense counsel pointed at Pineda's criminal convictions and suggested these made him a less credible witness.

Pineda testified the only time Rose threatened him was on October 7 when Pineda was walking the female customer to her car. Pineda testified he did not even speak to Rose on the day of the arrest (October 8) and that, during the earlier cigarette lighter incident, Rose had only been yelling "to himself," not at Pineda or any of the other people who were there at the time. But Officer Clark testified Pineda told him that Rose had threatened him on October 5, October 7, and October 8. On October 8, Pineda told the 911 operator Rose had returned and was threatening him again, which contradicted Pineda's testimony that Rose only threatened him once, on October 7.

Pineda testified he told his manager on the day of the arrest he was going to call the police because that's what they told him to do if Rose returned to the gas station. But the recording of the 911 call shows the operator only told Pineda to call back *if he needed help*. Not until the prosecutor prompted him with a question did Pineda testify he had been afraid on October 8.

There was testimony raising the question whether Pineda possibly had an alternative motive for calling the police, including this portion of his redirect testimony:

"Q. But is it part of your job when you work at this gas station to make sure the customers are happy?

"A. Yes.

"Q. And they don't feel like they're being harassed?

"A. Correct.

"Q. And you like to address the customers' concern[s] when they come and complain to you?

"A. Yes."

The jury might have inferred that Pineda, nervous about having allowed homeless people to congregate at the gas station, and worried he might get into trouble with his

16

boss after the female customer complained about Rose, either invented the threat entirely or exaggerated it, in order to get Rose removed from the station. Defense counsel argued that even if the jury believed Rose uttered the threat, there was no evidence Pineda actually suffered sustained fear, suggesting Pineda did not sound scared during the 911 calls on October 7, and that when the police called back after not immediately responding Pineda had no idea where Rose was.

After hearing this defense, which pinned everything on evidence undermining Pineda's credibility, the jurors began deliberating and were told by Juror No. 10 that she knew Pineda to be "a real pleasant guy," a "nice guy who was good to the customers" and "a calm person."

The presumption of prejudice flowing from jury misconduct can only be rebutted "if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' [Citation.]" (*In re Boyette, supra,* 56 Cal.4th at p. 890.)

Even if we were hesitant about finding prejudice solely because of the jury misconduct, we are convinced the cumulative effect of the jury misconduct *and* the instructional error discussed in Issue No. 1, *ante*, violated Rose's right to a fair trial. "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. [Citations.] Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Although the case at bar involved a very short trial, it was marred by two significant errors which, we conclude, "raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*Id*. at p. 845.)

We will reverse Rose's conviction.

17

4. *DNA penalty assessment should not have been imposed.*

In the event there is a retrial, we note that Rose contends, and the Attorney General concedes, the trial court erroneously imposed a $20 DNA penalty assessment, pursuant to Government Code section 76104.7, because there was no underlying fine to which this assessment could properly attach.

## DISPOSITION

The judgment is reversed. The People may elect to retry Rose within 60 days of the issuance of the remittitur.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

18