Filed 12/4/15  P. v. Ramirez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PETER TORRES RAMIREZ,<br><br>    Defendant and Appellant. | F068757<br><br>(Super. Ct. No. F10905108)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Sarah J. Jacobs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Peter Torres Ramirez was convicted at the conclusion of a jury trial of attempted murder of a peace officer in the performance of a duty (Pen. Code,[1] §§ 664, 187, subd. (a), count 1) and three counts of assault of a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2), counts 2, 3, & 4).[2] The jury further found true allegations in counts 1 through 4 that he personally and intentionally used a firearm (§ 12022.53, subd. (b)) and discharged a firearm (§ 12022.53, subd. (c)) in the commission of the offenses. On January 22, 2014, the trial court sentenced defendant to a total prison term of 55 years to life. The court awarded defendant 1,135 actual days of custody credits and 170 days of conduct credits.

Defendant contends the trial court erred in failing to grant his motion for a new trial based on alleged taint of the entire venire during jury selection and also for alleged jury misconduct that was discovered after the commencement of trial. Defendant argues there was insufficient evidence to support his conviction for attempted murder. The parties concede defendant is entitled to additional custody credits. We will remand for the abstract of judgment to be amended to reflect the additional credits and affirm the judgment.

# FACTS

The afternoon of September 28, 2010, Fresno County Sheriff's deputies were dispatched to a residence on North San Pablo in Fresno. Deputies were informed defendant was a wanted man and was alone inside the residence. Deputies were further informed defendant was armed and considered dangerous.

---

[1]Unless otherwise designated, statutory references are to the Penal Code.

[2]Prior to trial, defendant waived his constitutional rights and admitted he was a felon in possession of a firearm (§ 29800, subd. (a), count 5) and possessed ammunition (§ 30305, subd. (a), count 6). Prior to the jury verdict, defendant admitted allegations he had a prior serious felony conviction within the meaning of the three strikes law.

Sergeant Brad Christian arrived at the residence to oversee the operation with several other patrol units. They sought to establish a perimeter with deputies surrounding the house. Deputies Jose Diaz and Christian Curtice positioned themselves with Christian in front of the neighboring house prior to contacting defendant. The deputies were located in front of the neighbor's garage close together. Their weapons were drawn and they were standing in the open. The deputies positioned themselves at the neighbor's garage but because the defendant's residence had a recessed front entryway, the deputies could not see the front door from their vantage point.

Sergeant Christian called defendant at the residence, identified himself, told defendant the house was surrounded by officers, they were there to arrest him, and told him to come out with his hands up. Defendant replied he could not do that because he would rather kill himself than go back to prison. Defendant spoke in a normal, conversational, and level tone. Christian told defendant he needed to exit the house soon or Christian would order in the SWAT (special weapons and tactics) team. When Christian denied defendant's request to talk to a friend who was outside the home, defendant hung up the phone.

Deputy Curtice was positioned against the garage. Deputy Diaz was on one knee next to Curtice. Curtice had his .45-caliber sidearm unholstered and pointed toward defendant's residence. Diaz had a semiautomatic .223-caliber AR-15 rifle pointed in the same direction. Curtice heard a male voice and asked defendant if it was him. Defendant replied, "'Yeah, I'm coming out'" and "'I have a gun.'" Curtice ordered defendant to drop his gun and come out and walk straight down the walkway.

Defendant walked out with his hands up. He was holding a handgun in his right hand by the butt of the grip. The barrel of the gun was facing toward the ground. Defendant was between 20 and 25 yards away from Curtice, Diaz, and Christian. Defendant came out of the house moving slowly, cleared a bush, and made eye contact with Curtice, who was ordering him to drop his gun. Defendant then flipped the gun up

3.

into his right hand, dropped into a crouch, made a slight turn, leveled his gun, and pointed it at the three deputies and fired one round, causing a muzzle flash and a loud bang. No one was shot by defendant.

The three deputies fired back at defendant. Defendant fell to the ground. Curtice yelled at him to keep his hands where the deputies could see them but defendant failed to comply with this command. Curtice could not see defendant's gun on the ground and saw defendant moving his right hand down toward his side. Diaz fired another round at defendant. Defendant was groaning in pain and began to comply with the deputies orders. The gun was retrieved a few feet away from defendant. The deputies shot defendant eight times. Defendant had two wounds to his left hand, and single shots to the left wrist, the left inner arm above the elbow, a laceration wound below his left armpit, a wound to the center of his upper chest below the neck, a grazing gunshot wound across the top of his head, and a gunshot that passed through his left upper leg.

The defendant's handgun had malfunctioned. There were two bullets in the firing chamber. One bullet was blocking the other, causing a jam. The rounds were live.

Curtis Richardson lived across the street from the target residence and had a clear view of the incident. Richardson saw defendant pointing a gun at the deputies. Richardson heard the deputies announce themselves as being from the sheriff's department, demand defendant drop his weapon, and order defendant to the ground. Richardson heard defendant reply he was going to kill the officers or "'I'm going to kill you bastards.'" After defendant was shot and was lying on the ground, Richardson saw him reach over with his right hand and pick up the gun again and point it. The deputies shot defendant again and the incident was over.

Another neighbor, defense witness Gennadi Kosteniuk, heard officers yelling. Kosteniuk saw a man walking out of a house but saw nothing in the man's hands. Kosteniuk heard five to eight shots fired and saw the man fall to the ground. After he hit the ground, the man raised his hands and had nothing in them. Kosteniuk conceded he

4.

did not look "particularly" at the man's hands. Defendant's blood tested positive for methamphetamine at 0.43 milligrams per liter.

## DISCUSSION

### 1. Failure to Seek Dismissal of Venire

During jury voir dire, a prospective juror who was a correctional officer in the jail indicated he knew defendant because defendant was an inmate in the jail. Defendant argues the prospective juror also commented he would tend to believe sheriff's deputies more than other witnesses. The prospective juror was later dismissed. Defendant contends his trial counsel was ineffective for failing to make a motion to dismiss the entire venire. Defendant argues the venire was tainted because the prospective juror stated defendant was in custody, negating defendant's presumption of innocence, and the prospective juror vouched for the veracity of witnesses from the sheriff's department. We do not find error or that defense counsel was ineffective.

#### A. Voir Dire of Prospective Juror

During voir dire, prospective juror E.C. indicated he worked in the jail as a correctional officer and knew defendant. After viewing the witness list, E.C. indicated he knew Deputies Buenrostro, Diaz, and Alan Kelzer through his work with the sheriff's department. E.C. said he had worked with Kelzer and knew the other deputies through the course of his duties. When the court asked E.C. if there was anything that would affect his ability to be a fair juror, E.C. replied, "Probably so." E.C. gave the same response when asked if he would view the testimony of the deputies differently from the other witnesses. When the court asked if E.C. would view the testimony of the deputies more or less favorably, he replied, "Probably more favorably."

The court asked E.C. whether he would be able to use the same standards to each of the witnesses, whether they are from law enforcement or not, E.C. responded that he could. E.C. admitted, however, that he was concerned whether he could fairly listen to the testimony of Kelzer because he knew him better than the other deputies.

5.

During voir dire, the trial court instructed the jury as follows:

"The fact that [defendant] is in court for trial and that charges have been brought against him or that I refer to the alleged offense is no evidence whatsoever that a crime occurred or that he committed it if it did occur. Trial jurors may consider only evidence properly received in the courtroom in deciding whether the defendant is guilty or not guilty of the charges. In this case [defendant] has been arraigned, he has entered a plea of not guilty, which is a complete denial, making it necessary for the People, acting through the District Attorney, to prove guilt beyond a reasonable doubt. The law imposes no burden of proof on the defendant. A defendant need not prove his innocence. The entire burden rests on the People and until or unless the People prove guilt beyond a reasonable doubt, a defendant is presumed to be not guilty."

The court asked the prospective jurors if anyone had a problem with the presumption of the defendant's innocence or the People's burden of proof. No prospective juror indicated any problem with these instructions. The court further asked the prospective jurors if each of them would "be able to listen to the testimony of a peace officer and measure it by the same standards that you would use to judge the credibility of any other witness" and if anyone would "have any difficulty with that?" Again, no prospective juror said he or she would have difficulty evaluating the testimony of peace officers by the same standard as other witnesses. Also, at the conclusion of the trial, the jury was instructed with CALCRIM No. 103, the standard reasonable doubt instruction setting forth the presumption of innocence and the People's burden of proof beyond a reasonable doubt.

Outside the presence of the venire, prospective juror E.C. informed the court he did not feel it would be in defendant's best interest for him to sit on the jury. E.C. indicated that in his employment, he had seen the people defendant associated with and was aware of his classification level. The court excused E.C. for cause.

During the sentencing hearing, defendant made a motion in propria persona for a new trial based on, among other things, his trial counsel's ineffectiveness for failing to

make a motion to excuse the entire venire based on prospective juror E.C.'s comments during voir dire. The trial court denied the motion finding it without merit.

### B. Revealing Defendant's Custody Status

Some references to a defendant's custodial status, such as his appearance at trial in jail clothing, can impair the presumption of innocence and violate the defendant's right to due process and a fair trial. (*Estelle v. Williams* (1976) 425 U.S. 501, 512-513.) A defendant wearing jail clothing can turn into a constant reminder of the defendant's custody status. (*Id*. at pp. 504-506.) In *People v. Bradford* (1997) 15 Cal.4th 1229, 1336, the California Supreme Court held the mere fact the jury is made aware of a defendant's custodial status does not deprive a defendant of his or her constitutional rights. The *Bradford* court reasoned that in some circumstances, the jury will learn a defendant is in custody through the testimony of a jailhouse informant. (*Ibid*.)

In *People v. Ledesma* (2006) 39 Cal.4th 641, 681, the prosecutor asked a prospective juror who worked at the county jail whether he saw the defendant while working there. The trial court sustained an objection to the question by defense counsel. On appeal, the defendant contended the prosecutor's question was deliberately designed to inform the jury of the defendant's custodial status and undermine the presumption of innocence. The *Ledesma* court found no misconduct and no violation of the defendant's right to be presumed innocent. (*Ibid*.)

Although the *Ledesma* case involved a claim of prosecutorial misconduct, we find it factually analogous to the instant action. There, and here, the prospective juror worked at the county jail and the jury learned of the defendant's custodial status. Both *Bradford* and *Ledesma* held that a jury learning of the defendant's status, without more, was not a violation of a defendant's due process right to a fair trial and does not undermine the defendant's presumption of innocence.

We further note jurors are presumed to be able to understand, correlate, and to have followed the trial court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834,

7.

852; *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502.)  The trial court extensively instructed the jury venire on defendant's presumption of innocence and that the burden of proof rested with the People.  The trial court also instructed the jury with CALCRIM No. 103, the standard reasonable doubt instruction.  We therefore reject defendant's contention prospective juror E.C.'s comment affected the venire's understanding of the presumption of defendant's innocence because of a reference to his custody status.

### C. Vouching for Witnesses

We turn now to prospective juror E.C.'s alleged vouching for potential witnesses. Defendant argues E.C.'s statements concerning Deputies Buenrostro, Diaz, and Kelzer prejudiced the venire.  We initially observe that although Deputies Buenrostro and Kelzer were on the witness list, they were not called as witnesses.  Although Diaz was one of the alleged victims and did testify at trial, E.C. initially told the trial court he could follow the court's instructions on evaluating the credibility of witnesses, but would find it particularly difficult as to Deputy Kelzer because he had worked with him.

In *People v. Cleveland* (2004) 32 Cal.4th 704, 735, a prospective juror in a capital case was a retired law enforcement officer with substantial experience in homicide cases. He had testified in court over a thousand times, and expressed the opinion the death penalty was too seldom used.  Upon further questioning by the trial court, the prospective juror indicated he did not think he could be fair to the defendant and was excused for cause.  The defendant argued the prospective juror's comments tainted the venire.  (*Id*. at pp. 735-736)  The court in *Cleveland* found the error was forfeited for being raised for the first time on appeal and further there was no error.  (*Id*. at p. 736.)  Among the things *Cleveland* noted was the prospective juror was not a witness against the defendant, and his opinion on the death penalty was merely his opinion.  Also, the juror did not provide information specific to the case.  In *Cleveland*, unlike this case, the trial court did not reinforce the presumption of innocence.  (*Id.* at pp. 736-737.)

Defendant relies on *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630, 631-632. In *Mach*, the defendant was convicted of sexual conduct on a child who was only eight years old. During voir dire, a prospective juror, Bodkin, stated she had taken child psychology courses and had worked with psychologists, psychiatrists, and social workers. On four separate occasions she told the venire she had never been involved in a case of alleged child sexual abuse where the child victim's statements had not been borne out. After the trial court instructed the jury pool that jurors are to make determinations based on the evidence rather than their own experiences, Bodkin injected a further comment that she had never known a child to lie about sexual abuse. When the trial court asked the other potential jurors whether anyone disagreed with Bodkin, no one responded. (*Id.* at p. 633.) The court in *Mach* found the error rising "to the level of structural error." (*Id.* at pp. 633-634.)

We find the facts of the instant action inapposite to those in *Mach*. The prospective juror in *Mach* went on an unabated rant about the reliability of alleged child victims of sexual abuse. Even after the trial court attempted to instruct the jury concerning the need to rely on the evidence, the prospective juror made an unsolicited comment that she had never known a child to lie about sexual abuse. Nothing approaching this degree of vouching for the deputies on the witness list occurred here. Two of the witnesses, including the one prospective juror E.C. had the closest professional relationship with, did not testify at trial. E.C.'s comments were not as extensive as were the statements of the prospective juror in *Mach*.

As discussed above, the entire venire and later the jury were carefully instructed by the trial court on the presumption of defendant's innocence and the People's burden of proof. The jury was further instructed with CALCRIM No. 105 to evaluate the credibility and believability of all the witnesses by the same criteria. We find no error in the proceedings below. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

9.

would have been different.  (*People v. Maury* (2003) 30 Cal.4th 342, 389.)  Because defendant has not shown error, he has further failed to demonstrate the second prong of ineffective assistance of trial counsel, prejudice.

## 2.  Alleged Juror Misconduct

Defendant contends the trial court erred in denying his motion for a new trial in propria persona based on alleged juror misconduct.  According to defendant, the foreperson of the jury, Juror No. 10666683, intentionally concealed information she had a coworker who was married to a deputy sheriff who had been involved a few years earlier in a similar shooting incident.  Defendant argues he was denied the opportunity to exercise a peremptory challenge to the juror.  We do not find error.

### A.  Background

During voir dire, members of the venire were asked if they had been, or any family member or close friend had been, a complaining witness in a case like this one.  Juror No. 10666683 did not respond to the question.

The court conducted a hearing with Juror No. 10666683 outside the presence of the other jurors.  During the hearing, Juror No. 10666683 explained she had not forgotten her coworker's husband was a deputy sheriff.  But when she recently encountered him, it jarred her memory of a shooting incident he had been involved in years ago.  Juror No. 10666683 had very little information about the incident and assured the court she could be impartial.  Neither attorney had questions for the juror, nor did they find any basis to discharge her.  The trial court agreed.

When defendant brought his motion for new trial, the court denied it as being without merit.  The court found there was no evidence of jury misconduct by any juror.  Although Juror No. 10666683 brought a matter to the court's attention, the court found there was no cause to discharge her.

10.

**B.      Analysis**

A juror who conceals relevant facts during voir dire examination undermines the jury selection process and commits misconduct.  A prospective juror's false answers during voir dire can eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial.  Our Supreme Court has recognized that peremptory challenges provide a critical safeguard to a fair trial before an impartial jury.  Concealment by a juror, whether or not intentional, to questions bearing a substantial likelihood of uncovering a strong potential of juror bias undermines the peremptory challenge process.  A denial of this process, by a court or a juror concealing material facts, is a deprivation of an absolute and substantial right historically designated as one of the chief safeguards of a defendant against unlawful conviction.  (*In re Boyette* (2013) 56 Cal.4th 866, 889.)

In *Boyette*, a special master was appointed to determine several issues of alleged jury misconduct in a capital case.  (*In re Boyette*, *supra*, 56 Cal.4th at pp. 870-873.)  Among the issues raised was the failure of Juror Ary to accurately fill out a jury questionnaire.  In response to the questionnaire, Ary failed to disclose he had been charged in 1964 with two counts of robbery and grand theft, had a conviction for felony grand theft, was charged in 1971 with seven counts of robbery that were later dismissed, pled guilty in 1982 for misdemeanor driving under the influence of alcohol (DUI), and later had his probation for that conviction revoked.  (*Id*. at pp. 872-873.)  Ary believed, however, his service in the military led to the expungement of his 1964 felony conviction, did not believe the dismissed robbery allegations in 1971 had to be reported, and did not believe his DUI conviction was a criminal matter.  (*Id*. at pp. 873-874.)  The special master concluded Ary's nondisclosures were not intentional or deliberate and did not indicate juror bias.  (*Id*. at p. 874.)

Juror Ary further failed to accurately respond to the questionnaire concerning his relatives' criminal history.  His two sons and two other relatives had significant criminal histories.  (*In re Boyette*, *supra*, 56 Cal.4th at p. 877.)  As to the older son, Ary was

11.

estranged from him and did not learn the details of his arrest until after he was selected for the jury. The younger son was involved in a juvenile action and Ary did not believe he had to report it. (*Id*. at p. 878.) Concerning the two relatives who were serving sentences of life without parole for murder, Ary explained he did not disclose this information in the questionnaire because one was his ex-wife's nephew and Ary had no contact with him. The other relative, Ary's cousin, had been sentenced 50 years earlier and Ary also had no contact with him. (*Id*. at pp. 878-879.) The referee found Ary's nondisclosures were due to his belief he answered the questions accurately and any failures in his recollection were not intentional or deliberate. (*Id*. at p. 879.) Trial counsel filed a declaration that had he learned of evidence to the contrary, he would have exercised a peremptory challenge to remove the prospective juror from the jury. (*In re Boyette*, *supra*, at p. 889.)

*Boyette* noted that although juror misconduct raises a presumption of prejudice, on review courts determine whether an individual verdict must be reversed by applying the substantial likelihood test. The verdict will not be disturbed and the presumption of prejudice is rebutted if the entire record and surrounding circumstances indicate there is no reasonable probability of prejudice, "'"i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant."'" (*In re Boyette*, *supra*, 56 Cal.4th at pp. 889-890.) After considering the totality of the circumstances, the court concluded Ary was not a biased juror. The referee found some of Ary's omissions and his reading of the questionnaire were based on dubious interpretations of the relevant questions, and though they were erroneous and unreasonable, Ary's answers were sincerely held. *Boyette* noted Ary's failure, for example, to recall a distant relative, and it determined a good faith belief when answering questions in voir dire is the most significant indicator a juror is not biased. (*Id*. at p. 890.)

We find the facts surrounding Juror No. 10666683's late disclosure of the shooting incident involving her coworker's husband to be far less serious than the nondisclosures

by Juror Ary in *Boyette*. We agree with the People's assertion Juror No. 10666683 did not commit misconduct because the trial court's question in voir dire was directed to family, friends, or those with whom the potential juror had a close family relationship. Juror No. 10666683 had forgotten her coworker's husband had been involved in a shooting incident while working as a deputy sheriff. She did not remember details of the shooting and clearly the incident had not made a lasting impression on Juror No. 10666683. The fact Juror No. 10666683 was conscientious enough to bring the matter to the court's attention prior to going into deliberations indicates she was not intentionally concealing information and was not biased against defendant. Furthermore, Juror No. 10666683 told the trial court she could remain impartial.

Even if we were to find a presumption of juror misconduct by Juror No. 10666683's late disclosure of information, reading the entire record and surrounding circumstances, the presumption of prejudice is rebutted here because there is no substantial likelihood Juror No. 10666683 was actually biased against defendant. (*In re Boyette*, *supra*, 56 Cal.4th at pp. 889-890.) The trial court did not err in denying defendant's motion for a new trial based on the alleged misconduct of Juror No. 10666683.

### 3. Substantial Evidence of Attempted Murder

Defendant contends there was insufficient evidence he had the intent to kill, negating a key element of his conviction for attempted premeditated murder of a peace officer. Defendant argues that although Deputy Curtice testified defendant pointed the gun directly at him, there was no forensic evidence to corroborate this testimony and the bullet defendant fired was not recovered. Defendant also asserts that because he told Sergeant Christian on the phone that he would rather die than go back to prison, the evidence shows defendant intended to assault the deputies to provoke them into shooting him. Defendant further asserts he was under the influence of drugs at the time of the shooting and could not form the intent to kill. We reject these contentions.

13.

The proper test for determining whether there is sufficient evidence is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. We must view the evidence on appeal in the light most favorable to the People and presume every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. Attempted murder includes the element of the specific intent to kill coupled with the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Perez* (2010) 50 Cal.4th 222, 229.)

"[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) There is rarely direct evidence of the defendant's intent, which must usually be derived from all the circumstances. The fact the shooter fired only once and then abandoned further efforts out of necessity or fear does not compel the conclusion the shooter initially lacked animus. A victim's escape from death only because of the shooter's poor marksmanship does not necessarily establish the shooter has a less culpable state of mind. (*Ibid.*)

The act of firing toward a victim at close, but not point blank range, in a manner that could have inflicted a mortal wound had the bullet been on target, is sufficient to support the inference of an intent to kill. (*People v. Perez*, *supra*, 50 Cal.4th at p. 230; *People v. Smith*, *supra*, 37 Cal.4th at p. 741.) When a defendant shoots into a crowd of people with the intent to kill whoever is struck by the bullet, only a single count of attempted murder can be sustained, not multiple counts of attempted murder. (*Perez*, at pp. 230-231.)

Defendant fired directly into a group of deputies at close range. Defendant pretended to come out of the house peaceably but then flipped the gun into his hand and dropped into a crouching position, aiming his gun at the deputies. Deputy Curtice saw defendant look him directly in the eye prior to pointing the gun at Curtice and shooting. One eyewitness heard defendant yell to the deputies prior to leaving his residence that he

14.

was "going to kill you bastards." The muzzle flash was seen and the report of the shot defendant fired was heard by multiple witnesses. Even after being shot several times by deputies, defendant moved his hand in an apparent attempt to retrieve his gun again and, after being shot once more by deputies, finally followed the directives of the deputies.

Although defendant had methamphetamine in his system, there was no indication in the record this compromised his ability to form specific intent. Defendant points only to the evidence supporting the theory he was attempting suicide at the hands of the deputies. We cannot accept defendant's invitation to do the same on appellate review but must indulge all reasonable inferences in support of the judgment that are supported by substantial evidence. There was substantial evidence adduced at trial that defendant harbored the specific intent to kill sheriff's deputies as well as to support defendant's conviction for attempted murder.

## 4. Custody Credits

Defendant contends, and the People concede, he is entitled to additional custody credits. Defendant was arrested on September 28, 2010, and sentenced on January 22, 2014. The original probation report was prepared on October 29, 2013, and set forth defendant had 1,135 days in custody and 170 days of conduct credits between September 28, 2010, and November 5, 2013, pursuant to section 2933.1. At that time, defendant's total custody credits were 1,305 days.

Sentencing was continued to January 22, 2014. A supplemental probation officer's report indicated as of January 22, 2014, defendant had 1,213 days in custody and conduct credits of 181 days, or 1,394 days of total custody credits. The trial court, however, granted defendant only 1,305 days of total custody credits on January 22, 2014. This was error. We will direct the trial court to prepare an amended abstract of judgment to show defendant's total custody credits as noted above.

**DISPOSITION**

The case is remanded for the preparation of an amended abstract of judgment to reflect defendant has 1,213 days of actual custody credits and 181 days of conduct credits for total custody credits of 1,394 days. The court shall forward the amended abstract to the appropriate authorities. The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.

16.